**NORFOLK SOUTHERN CORPORATION, et al., Plaintiffs,**

v.

**Charles M. OBERLY, III, et al., Defendants.**

Civ. A. No. 84–330.

United States District Court,
D. Delaware.

Sept. 25, 1984.

David S. Swayze, and Susan C. Del Pesco, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiffs; Jeffrey S. Berlin, David E. Menotti, Russell E. Pommer, Robert C. Fisher, and Mark E. Martin, Elizabeth A. Campbell, Verner, Liipfert, Bernhard and McPherson, Chartered, Washington, D.C., A. Gayle Jordan, Norfolk, Va., of counsel.

Fred S. Silverman, Regina M. Mullen, John J. Polk, and Ellen R. Chaikin, Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

LONGOBARDI, District Judge.

The Plaintiffs, Norfolk Southern Corporation ("Norfolk Southern") and Norfolk Southern Marine Services, Inc. ("Marine Services"), seek a preliminary injunction against John E. Wilson ("Wilson"), Delaware's Secretary of the Department of Natural Resources and Environmental Con-

trol ("DNREC"), and Charles M. Oberly, III ("Oberly"), Attorney General of the State of Delaware. More particularly, Plaintiffs seek to enjoin the Defendants and their agents and employees from enforcing that portion of the Delaware Coastal Zone Act ("CZA"), 7 *Del.C.*, Ch. 70, that has been held applicable to their proposed vessel-to-vessel coal top-off project in the Delaware Bay and requiring Wilson to process their pending applications for air pollution control permits under Delaware Environmental Protection Law, 7 *Del.C.*, Ch. 60. They contend the CZA is unconstitutionally violative of the commerce clause.

CZA was enacted by the Delaware Legislature in 1971 and the avowed purpose of the Act was to control the location, extent and type of industrial development in Delaware's coastal areas. The control of such industrialization, it was hoped, would better protect the natural environment of the bay and coastal areas and safeguard their use primarily for recreation and tourism. 7 *Del.C.* § 7001. Section 7001 also provided:

> ... that offshore *bulk product transfer facilities* represented a significant danger of pollution to the coastal zone and generate pressure for the construction of industrial plants in the coastal zone, which construction is declared to be against public policy. For these reasons, prohibition against *bulk product transfer facilities* in the coastal zone is deemed imperative. (emphasis added).

"Bulk product transfer facility" is defined as "any port or dock facility, whether an artificial island or attached to shore by any means, for the transfer of bulk quantities of any substance from vessel to onshore facility or vice versa. Not included in this definition is a docking facility or pier for a single industrial or manufacturing facility for which a permit is granted or which is a nonconforming use. Likewise, docking facilities for the Port of Wilmington are not included in this definition." 7 *Del.C.* § 7002. Administration of the Act is by the Secretary of DNREC, Wilson, and appeals from his decisions are heard first by the State Coastal Zone Industrial Control Board ("Board"), section 7007(a), whose decisions are binding on all the agencies of the State of Delaware. Under section 7010, the Attorney General, Oberly, is responsible for enforcing the CZA, for using cease and desist orders and for recovering monetary penalties that can go as high as $50,000 per day of violation.

Appeals from the Board are heard by the Superior Court of Delaware and appeals from that court are heard in the Supreme Court of Delaware.

The Plaintiffs became interested parties in a proposal to transport and sell coal on the international market. Existing port facilities on the East Coast, however, allow only the loading of ordinary sized colliers or partial loading of super colliers. Super colliers are ships with coal carrying capacities ranging from 100,000 to more than 160,000 deadweight tons ("DWT"). Super colliers are obviously much more cost effective to operate than smaller vessels provided they are fully loaded. Because the super colliers cannot be fully loaded from any East Coast port, they would have to be "topped-off", the loading of additional coal to ship's capacity, in deeper water away from the existing ports. Big Stone Anchorage is the sole naturally protected anchorage with a depth of 55 feet or more between Maine and Mexico. It lies within the Delaware Bay and well within the zone protected by CZA. The anchorage is presently utilized for oil lightering, the transfer of oil from super tankers to smaller vessels capable of navigating East Coast rivers and harbors.

Plaintiffs' plan is to partially load super colliers at existing ports and then move the ships to Big Stone Anchorage. Two specially constructed, fully loaded coal barges, part of the top-off project, will then deliver their coal to the holds of the super colliers. After unloading, the barges will return to local ports for loading preparatory to the next top-off job at Big Stone Anchorage. It is estimated by the Plaintiffs that each of the two barges will be capable of making 60 such trips per year and, when the

project is fully established, the top-off project will be handling 3,000,000 tons of coal annually from Big Stone Anchorage. These are necessarily projections only because there is no comparable service elsewhere in the United States which could provide the basis for empirical data. The volume of tonnage is contested by the Defendants who have supplied the Court with articles denigrating the value of a top-off project in the United States. The reports are skeptical that there will be a substantial foreign market for American coal. Among the premises for the conclusion is that costs of mining and interstate shipment, primarily by companies like those associated with Norfolk Southern, push the costs of American coal beyond the competitive world-wide market. Interestingly, the conclusions are reached without material regard to cost of international shipping, a premise that strikes at the heart of Plaintiffs' projections for a world market for American coal shipped from Big Stone Anchorage.

Pursuant to 33 U.S.C. § 471, Big Stone Anchorage is subject to the jurisdiction of the United States Coast Guard. In 1982, it proposed to change the designation of Big Stone Anchorage to a "general anchorage." Previously, the "specific" purpose of the anchorage was to allow deep draft tankers to anchor and lighter their cargoes of imported oil. The new Rule was designed to permit "shippers transporting commodities other than oil to use [Big Stone Anchorage] as both a holding anchorage and an anchorage for lightering." 33 C.F.R. 110.157. In response to the notice, the Governors of Delaware, Maryland and Pennsylvania endorsed the proposed change and specifically endorsed the coal top-off project. Comments in support of the proposal were filed by affiliates of the Plaintiffs, operators of railroads and by exporters of coal. DNREC did not endorse the proposal, noting that vessel-to-vessel coal transfer posed the potential for water pollution and suggesting that the Coast Guard determine the environmental impact of coal top-off operations at the anchorage. The Coast Guard formally changed the designation of Big Stone Anchorage to a "general anchorage" in May, 1983. 48 Fed.Reg. 23,636 (1983).

It is not absolutely clear from the present record but there are indications that what prompted the Coast Guard to change the designation of the anchorage could have been based in part on the efforts by one J. Patrick Dowd, a Vice-President of Coastal Barge Corporation ("Coastal Barge") and President of Coal Logistics Corporation ("Coal Logistics"). Dowd and the corporations are not parties to this litigation but they play a major role in the scenario that covers this federal action. Coastal Barge, however, is a party to a state court action that is now pending in the Supreme Court of Delaware. A decision in that appeal could very well moot this federal action. (The Court will deal with that issue later in this opinion.)

Dowd started thinking about a coal top-off operation in 1981. (Transcript of Superior Court hearing, August 7, 1984, p. 10, hereinafter referred to as "Super. Trans.") Because oil lightering had been in process in the bay for many years, he saw no reason why coal top-off could not be utilized. He commenced negotiations with Norfolk Southern whose subsidiaries move more export coal than any other shipper in the United States. Super.Trans., p. 12. Somewhat later, around October, 1982, Dowd met with David Hugg of the DNREC together with three Japanese coal buyers. The purpose of the meetings was to get a feel for Delaware's reaction to the project. Although environmental concerns were evident, as corroborated by Hugg's earlier letter to the Coast Guard, Hugg assured Dowd that the CZA was not applicable to the project.

Subsequent visits raised no concerns about the applicability of CZA. After the Coast Guard approved the designation for the anchorage, Dowd commenced a series of complicated financial arrangements and business agreements that are the basis for this claim of irreparable harm. First, Lamberts Point Barge Co., Inc., a wholly owned subsidiary of Norfolk Southern, ordered the construction of Thoroughbred Topper

("Topper"), a new 35,000 ton barge. Norfolk Southern has approximately 5 million dollars invested in the vessel which is also subject to a permanent mortgage of $15,564,000. In William J. Romig's statement dated August 17, 1984, he said Topper was chartered by Marine Services.

Marine Services then chartered the barge "Producer", a 21,000 ton converted tank barge, from Coastal Carriers Corporation ("Coastal Carriers"), a company affiliated with Coastal Barge.

Marine Services chartered the oceangoing tug "Five Brothers" from Coast Tug No. 1 Limited Partnership in which Coastal Barge is general partner.

Marine Services engaged Coastal Barge to operate the three vessels and then engaged Coal Logistics to manage the top-off project. Coal Logistics is a company affiliated with the Dowd interests.

All of these things occurred between August 17 and August 19, 1983. Within two months thereafter, the principals claim they were aware of their jeopardy under the CZA for the first time. Statements by public officials questioning the legality of Plaintiffs' operation appeared in the local press. Dowd and his associates called the Governor's office and, as a result, a meeting with public officials ensued. It would be fair to characterize the meeting as unsettling and inconclusive. There were some questions that remained to be answered. The controversy continued to brew until in February, 1984, Wilson suggested that Coastal Barge submit an application to DNREC for a "Delaware Coastal Zone Act Status Decision." If the principals did not actually know previous to this time that the CZA was implicated, there is no question about their knowledge of such after they received Wilson's letter. And like their inaction in the early fall of 1983, just eight weeks after their extensive financial arrangements had been made, they similarly did nothing to mitigate their losses or to stay the various contracts even for a forfeiture fee until many months later when the barges were put to alternative uses. Even at that, it is costing Marine

Services about $11,000 per day. Norfolk Southern's loss is a highly speculative and incalculable loss. They contend their railroad subsidiaries are losing gross revenues because they are not shipping coal from Appalachian coal mines to Norfolk for the top-off project.

One day after Wilson's letter, on February 21, 1984, Coastal Barge submitted an application for a status decision. One day later, February 23, 1984, Wilson issued a status decision in which he concluded that the top-off project was not a "bulk project transfer facility" within the meaning of section 7002(f) of the CZA. The decision did not purport to relieve Coastal Barge of the environmental protection prerequisites of 7 *Del.C.*, Ch. 60.

On March 7, 1984, there was an appeal to the Board and they rendered a decision on May 7, 1984. The Board reversed Wilson and held that the Plaintiffs' proposed top-off project constituted a "bulk product transfer facility" as construed by section 7002(f) of the CZA and, consequently, the project is prohibited by section 7003. On May 15, 1984, Coastal Barge filed an appeal to the Superior Court. In an attempt to accelerate the appellate process, the parties were able to convince the court to certify the question in issue to the Supreme Court. The Supreme Court rejected certification and, thereafter, the Superior Court decided the issue on August 29, 1984. It affirmed the decision of the Board.

In the meanwhile, Plaintiffs filed this action for declaratory judgment and injunctive relief on June 15, 1984, but did not move for injunctive relief until August 20, 1984.

The Plaintiffs contend that the state's decision construing their top-off project as a "bulk product transfer facility" and, therefore, a prohibited activity under the CZA, constitutes an unlawful discrimination against interstate commerce. Alternatively, the Plaintiffs contend that if the statute is not construed as a *per se* prohibition of interstate commerce, then the enforcement of the Act to this particular activity imposes unconstitutional burdens on

interstate or foreign commerce. They contend that the constitutional violations establish their burden of proving probable success on the merits of their claim and that the violation of the commerce clause is *per se* proof of the irreparable harm necessary to establish the right to preliminary injunctive relief. Alternatively, they argue that the large sums of money being lost daily also establish irreparable harm.

The Defendants, on the other hand, deny that the prohibition of this coal top-off project is a *per se* prohibition of interstate commerce and that the burdens on inter-. state commerce are amply displaced by the benefits derived from the enforcement of the CZA. They also suggest that the prohibition of the top-off project should be construed by a standard similar to that used in commerce clause cases involving highway safety, *i.e.*, the "deferential approach." They contend that the state owns the subaqueous land at Big Stone Anchorage and has the inherent right to control its use. Finally, they contend that Congress' enactment of the Coastal Zone Management Act, 16 U.S.C. § 1451, *et seq.*, and the receipt of benefits under that bill constitutes the Federal government's approval of Delaware's CZA. The approval, they allege, precludes any constitutional attack on the CZA.

■ A preliminary injunction is not granted as a matter of right. *Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, 630 F.2d 120, 136 (3rd Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). It is an extraordinary remedy and should be sparingly granted. *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C.Cir.1969); *Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc.*, 376 F.2d 543, 547 (3d Cir.1967). "There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury...." *Detroit News. Pub. Ass'n v. Detroit Typo.*

*Un. No. 18, etc.*, 471 F.2d 872, 876 (6th Cir.1972) (quoting 3 Barron & Holtzoff, *Federal Practice and Procedure* (Wright, Ed.) section 1731).

■ A preliminary injunction requires a strong showing of necessity. *A.O. Smith v. F.T.C.*, 530 F.2d 515, 527 (3d Cir.1976).

The Third Circuit has identified four factors which the Court must weigh in exercising its discretion whether to grant the injunction:

[T]he moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunctions, and (4) the public interest."

*Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975) (citations omitted); *Constructors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d 811 (3d Cir.1978).

■ The term "irreparable injury" is somewhat misleading since irreparability is only part of the requirement. The plaintiff must also show that the injury is "special, peculiar or work[s] an onerous hardship." *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola*, 563 F.Supp. 1122, 1141 (D.Del. 1983); *See, A.O. Smith v. F.T.C.*, 530 F.2d at 527 ("the threatened injury must be in some sense 'peculiar'").

In this case, Plaintiffs emphasize two primary sources of irreparable injury. First, they assert that Marine Services is losing about $11,000 per day in fixed costs for ships which cannot be used for their intended purpose. Second, Plaintiffs argue that deprivation of their constitutional rights under the commerce clause in itself constitutes irreparable injury.[1]

---

1. While Plaintiffs have emphasized these two sources, they have also pointed to an unquantifi-

able loss of revenue to Norfolk Southern's rail-

Any monetary loss suffered by Plaintiffs due to the allegedly unconstitutional statute will not be recoverable if Plaintiffs ultimately prevail on the merits. Their injury is, therefore, irreparable in the sense that it is unrecoverable immediately. If they prevail on the merits, however, it could very well be recovered from profits over an extended period of time. The question is whether their injury is sufficiently "peculiar" to satisfy the requirements for a preliminary injunction.

Plaintiffs erroneously characterize their injury as being equal to the fixed costs of the ships intended for use in the topping-off project less the revenues they have been able to derive from using the ships for other purposes. The fixed costs cannot constitute Plaintiffs' injury from denial of the injunction since the fixed costs must be incurred whether or not the injunction is granted. The true monetary injury to Plaintiffs is equal to a loss of profits or at least greater revenues. (And this assumes their operation can pass the scrutiny of the air and water pollution standards under 7 *Del.C.*, Ch. 60, a statute which is not under attack in this law suit. In light of the present record, their ability to comply with air and water pollution regulations may be most difficult to prove. The issue is one that has been heatedly debated.) It is this aspect of the present facts, however, which poses the greatest problem for not just calculating but even estimating future revenues or future losses. No one, not even the Plaintiffs, has empirical data to support the suppositions contained in the deposition of Allen B. Childress.[2] At best, they are speculative assumptions dependent upon any number of various factors, any one of which, if adversely affected, could skew the projections into a financial disaster. This is not pure conjecture but based on facts in the present record. These facts, presented by the Defendants, suggest that

the coal export market is quite weak at the present time and suggests that the components of pricing for United States coal make it not very competitive.[3]

But that is not all. The uncertainty of what is at stake here is heightened when one considers that what will be recovered if the Plaintiffs are allowed to proceed will not be fully realized until the passage of an appreciable amount of time characterized as a "start-up period." If everything proceeds as planned, projected revenues by 1986 will amount to 10 million dollars per year.[4] Obviously, the vagaries of business conditions could prolong the start-up period and, yes, it could even shorten it. The point is, however, that whatever the case, the present record for irreparable injury is based on speculation and uncertainty. And this hardly presents the situation which lends itself to some reasonable degree of definition, to some fair estimate of irreparable harm. Projections of future growth are necessarily the ingredients for continued business success. Whether the projections meet the standards for establishing irreparable harm, however, appear to be somewhat of a different case. *Cf., A.O. Smith v. F.T.C.*, 530 F.2d at 528; *Constructors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d at 819.

In *A.O. Smith v. F.T.C.*, 530 F.2d 515, the plaintiffs contended that the Federal Trade Commission had illegally issued orders requiring them to file Line of Business ("LB") Reports. The Third Circuit held that the costs of preparing the reports did not constitute irreparable injury although plaintiffs could not recover their costs even if they prevailed on the merits. The Court reasoned:

> [T]he alleged injury was "unrecoverable costs and commitment of diverse business resources." Without intending to disparage the importance of such an injury, we observe that all that is lost is

road subsidiaries resulting from lower coal shipments. Plaintiffs' Opening Brief, p. 55–56.

**2.** Childress Statement, p. 6, 8.

**3.** Attachments 3 and 4 to Chaikin Statement.

**4.** This figure is consistent with testimony by Thomas H. Kerwin, Vice-President and Treasurer of Norfolk Southern, in the proceedings before the Superior Court. Super.Trans., p. 76.

profits. Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, "peculiar." ... These are not "small" corporations; there is no contention that compliance with the LB program would render any appellee unable to meet its debts as they come due. Nor is there any contention that the cost of compliance would be so great *vis à vis* the corporate budget that significant changes in a company's operations would be necessitated.

530 F.2d at 527–28.

The court did not establish a general standard for determining when a loss is "peculiar" but did note that "a corporate liquidity crisis or significant changes in company operations" were not necessarily required. *Id.* at 527 n. 9a. Unrecoverable losses of over 30 million dollars have been held sufficient to constitute irreparable injury where this resulted in an operating loss to one of the plaintiffs even though the plaintiffs' solvency was not threatened. *Northern Natural Gas v. U.S. Dept. of Energy*, 464 F.Supp. 1145, 1155–58 (D.Del. 1979).

This is not to suggest that lost profits may never be the basis for establishing irreparable injury. Curiously, however, the Plaintiffs have not alleged that the daily loss of fixed costs impairs the solvency of their operations or even jeopardizes their vitality. The annualized sum, accepting Plaintiffs' contentions, is an onerous expense but on the whole represents something less than one per cent of Norfolk Southern's 1983 pre-tax earnings of 604 million dollars.[5]

On the whole, this case is, therefore, not similar to *Northern Natural Gas, supra*, in which the injury would have resulted in an overall loss to one of the plaintiffs. Rather, this case is analogous to *Phillips Petroleum v. United States Steel Corp.*, 566 F.Supp. 1093, 1103 (D.Del.), *aff'd*, 727 F.2d 1120 (Fed.Cir.1983), which held that an unrecoverable loss of $700,000 to United States Steel did not constitute irreparable injury.

If the conclusions of the Court on irreparable injury appear somewhat disdainful, it should be remembered that Plaintiffs took a rather cavalier attitude in determining their status under the CZA. Even after getting notice of their jeopardy in the early fall of 1983, they did nothing to protect their interests or mitigate their losses. Their protestations to the contrary, the Court is convinced that a reasonably prudent investor should have known that CZA was at least an administrative hurdle that had to be accommodated before proceeding with this project. Why else did Dowd meet with DNREC personnel in 1982 and early 1983 other than to inquire about the application of the CZA. Admittedly, that was at least one topic for discussion. In addition, they were aware that there were inquiries made by other people regarding the applicability of CZA to a coal top-off project.[6] And, in spite of the fact that state personnel voiced their opinion that the CZA was not applicable, Plaintiffs knew of the law and its prohibitions of industralization along Delaware's Coastal area. Under these circumstances, it was at least foolhardy to embark on million dollar expenditures before they were sure of the legality of their project. The opinions of state personnel cannot rise to the level of a formal administrative hearing, even if the agency's chief gives an "off-the-cuff" opinion.

It is quite clear from the statute that neither the Secretary nor the other state officials consulted by Plaintiffs has the final say in determining the construction of

---

**5.** Attachment 1 to Chaikin statement.

**6.** Letter from David Hugg to Elias Kulukundis, dated September 7, 1982. Appendix to Plaintiffs' Answering Brief, p. A–2.

the Act. Further, the Act specifies a clear and expedited procedure for obtaining an authoritative review of the Secretary's decision. Plaintiffs and the Dowd interests could have followed this procedure prior to signing the contracts and incurring major expenses on the project but failed to do so. The Court cannot allow Plaintiffs to bootstrap a claim for irreparable injury by incurring obligations in utter disregard of state regulatory uncertainties. *Downstate Stone Co. v. United States*, 651 F.2d 1234, 1242 (7th Cir.1981). To rule otherwise is to place in the hands of enterprising individuals the key to injunctive relief.

Plaintiffs argue that the denial of their constitutional right to carry on interstate commerce is in itself an irreparable injury. The Supreme Court and the Third Circuit have recognized that a violation of constitutional rights, even for a minimal period of time, can constitute irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (first amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir.1971) (search and seizure).

Plaintiffs have not, however, cited any authority holding that a violation of commerce clause rights constitutes irreparable harm. The Third Circuit has made it clear that not all violations of constitutional rights constitute irreparable injury. In *Constructors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d 811, plaintiffs sought a preliminary injunction enjoining compliance with a statute requiring that 10% of all federal funds for certain public works projects be expended in contracts with minority business enterprises. Plaintiff was a trade association of white-owned construction contractors. Plaintiff claimed, *inter alia*, irreparable harm due to denial of its members' equal protection rights under the fifth amendment. The Third Circuit, after noting that Plaintiff had not demonstrated a probability of success on the merits, ruled, "unlike first amendment rights whose deprivation even for minimal periods of time constitutes irreparable injury ... a denial of equal protection rights may be more or less serious depending on the other injuries which accompany the deprivation." *Id.* at 820 n. 33 (citations omitted).

Similarly, where the loss to Plaintiffs is purely monetary and that loss by itself is not an "irreparable injury", any violation of the commerce clause does not constitute irreparable injury *per se*. The Court concludes that any possible violation of the commerce clause is not the same as a violation of first amendment rights.

In weighing the totality of circumstances to determine the possibility of harm to third parties or to the public interest, the Court is mindful of the delicate balance of interests which are presented by this petition. The claims of interest and the jeopardy of those interests applicable to the Plaintiffs have already been discussed. What has not been discussed, however, are the implicated interests of the State of Delaware if this Court were to grant a preliminary injunction. The people of the State of Delaware, acting through their elected officials, have duly enacted into law a consensus about the quality of life they seek for themselves and their posterity. They seek by the CZA to protect their environment and preserve the immensely valuable coastal area of their state. In the fashion approved by the mandates of our democratic process, they have elected to forego industrialization, the profits, the jobs and obvious economic benefits flowing from such development in favor of protecting and preserving their environment. These are noble efforts and should not be lightly dismissed. As diligent and anxious as the federal courts must be to protect federal rights and federal interests, we must be ever mindful of the critical role played by our states and their agencies in our federalism. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). If our intrusion becomes too great, we lay the groundwork for the suppressing of the public will. It is a concern that should prompt our forbearance in matters that unduly and unnecessarily "interfere with the legitimate activities of the States."

*Younger v. Harris, supra,* at 44, 91 S.Ct. at 750.

In this instance, there is a great deal at stake for the State of Delaware. The granting of our injunction will for most purposes sweep aside the prohibitions of the CZA, open the door to a project declared by an Administrative Board and a Delaware Court as prohibited practice and sweep aside the legitimate interests of the public in the CZA and the procedure for protecting those interests.

There is now pending before the Supreme Court of Delaware a controversy involving corporations which are not parties to this action but certainly principals in the total scheme of the top-off project. Coastal Barge seeks a reversal of the Superior Court's decision that decided the coal top-off project is a bulk product transfer facility and, therefore, a prohibited practice under the CZA. A favorable determination of that issue for Coastal Barge will moot the constitutional issues in this case. The state action was filed first; it has proceeded in an orderly and efficient manner. To the date of its appeal to the Supreme Court, it was even given preferential treatment in spite of the critical issues involved.[7] Wilson acted within one day and the Superior Court, rather than rule on a stay, ruled on the merits of the appeal. From February, 1984, to August 29, 1984, their case has proceeded from the Secretary of DNREC to the Board, to the Superior Court and is now pending before the Supreme Court of Delaware.

 In deference to that procedure now pending before the State Supreme Court, this Court is not prepared to discuss Plaintiffs' probability of success on the merits of its constitutional claims. First, it is not necessary. The Court has found that the Plaintiffs have not carried their burden in establishing irreparable injury. On balancing the equities, it is apparent that Plaintiffs precarious position was unjustifiably and recklessly self imposed and they should not be entitled to bootstrap themselves to relief. If relief were to be granted, the status quo would not be maintained and the Plaintiffs would have gained everything they would have gained after a trial on the merits. *Dorfmann v. Boozer,* 414 F.2d 1168, 1173 n. 13 (D.C.Cir.1969); *Selchow & Righter Co. v. Western Printing & L. Co.,* 112 F.2d 430 (7th Cir.1940). Third parties and the public interests would be adversely and unnecessarily affected if the injunction were granted.

Finally, any discussion of the constitutional claims would impose a serious cloud over what should be a free and unencumbered exercise of the Delaware Supreme Court's legitimate and unique jurisdictional function.

For all these reasons, the motion for a preliminary injunction is denied.

---

**7.** One gets the impression of a frenzy of activity in this case. The Plaintiffs and their related parties have pushed for accelerated treatment throughout and, to this date, have received it.