**COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., et al., Plaintiffs,**

**v.**

**The COCA–COLA COMPANY, Defendant.**

**Civ. A. No. 81–48 MMS.**

United States District Court, D. Delaware.

Sept. 1, 1987.

Edmund N. Carpenter II, Charles F. Richards, Jr., Jesse A. Finkelstein, of Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant, Jane V. Vehko, and Jeffrey D. Horst, of Bondurant, Mixson & Elmore, Atlanta, Ga., J. Barry Epperson, of Epperson, Goodpaster & Johnston, Tulsa, Okl., M.B. Jackson, of MacDonald, Halsted & Laybourne, Los Angeles, Cal., of counsel), for plaintiffs and intervenors.

Andrew B. Kirkpatrick, Jr., Richard D. Allen, and Michael Houghton, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. OF COUNSEL: (Griffin B. Bell, Frank C. Jones, Chilton Davis Varner, and Dwight J. Davis, of King & Spalding, Atlanta, Ga., of counsel), for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

The battle between the Coca-Cola Company ("Company") and a shrinking band of bottlers has escalated with the Company's proposal to supply the plaintiffs with sucrose-sweetened Coca-Cola syrup ("sucrose syrup"). Plaintiffs filed motions for a preliminary injunction to enjoin the Company from supplying sucrose syrup and to amend their complaint to more accurately reflect their claims in light of developments since this action was instituted in 1981. A two-day hearing was conducted on July 8 and 9, 1987. The Court will briefly review the events leading up to the present circumstances of the parties' relationship before considering the motions. Plaintiffs' motion for a preliminary injunction will be denied because they cannot prove either that the Company's threatened action will irreparably harm them or that there is a reasonable likelihood of success on the merits. The Court will grant the motion to amend the complaint.

## I. BACKGROUND

In January, 1980, the Company began using high fructose corn syrup ("HFCS–55") instead of sucrose to sweeten the Coca-Cola syrup supplied to bottlers. *See Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 654 F.Supp. 1388, 1390–91 (D.Del.1986) (*"Coke III"*) (describing HFCS–55). A group of approximately 120 bottlers, called "unamended" bottlers, brought suit over the use of the HFCS–55 in 1981. The Bottler's Contract contains a pricing provision for Coca-Cola bottler's syrup based on the market price of sugar as quoted by the ten largest sugar refineries in the United States. *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 654 F.Supp. 1419, 1424 n. 2 (D.Del.1987) (*"Coke IV"*). The heart of the dispute concerns the Company's continued uses of the price formula for sugar while using the lower cost HFCS–55 without passing those savings along to the unamended bottlers.

After a 16–day trial in 1986 concerning the meaning of the terms "sugar" and "market price" in the 1921 Consent Decrees, the court held that " 'sugar' for the purposes of paragraph 10 means refined granulated sugar from cane or beet, and therefore HFCS–55 is not sugar as that term is used in paragraph 10 of the 1921 Consent Decrees...." *Coke III*, 654 F.Supp. at 1391. The Company filed a motion to amend the *Coke III* findings, which was denied. *Coke IV*, 654 F.Supp. at 1429. The Court also determined which unamended bottlers have standing to sue for breach

of the Consent Decrees, and which are limited to breach of contract claims. *Id.* at 1433–37.

Prior to the denial of the motion to amend the *Coke III* findings, the Company informed the unamended bottlers on January 6, 1987, that as of May 1 the opportunity to sign the 1978 and 1983 Bottler's Contract Amendments would be withdrawn. Upward of 97% of the distribution volume is now covered by these Amendments, with the 1978 Amendment containing a pricing provision different from the plaintiffs' unamended contracts. The 1978 amendment permits the Company to supply HFCS–55 sweetened syrup, and the 1983 Amendment covers supplies and pricing of diet Coca-Cola.

On March 16, 1987, the Company sent the plaintiffs a letter informing them "that effective as of September 1, 1987, the Company will supply you or your authorized processor Coca-Cola Bottler Syrup that is sweetened 100% with sucrose."[1] Plain-

tiff's Motion for Preliminary Injunction, Docket ("Dkt.") 563, Exhibit A ("Sucrose Letter"). The Company imposed a July 1 deadline for accepting an offer to receive HFCS–55–sweetened bottler syrup ("HFCS–55 syrup") on condition the plaintiffs waive any future claim for breach of the Bottler's Contract and Consent Decrees, and any damages related to the Company's pricing practices for the syrup. Upon filing the motion for preliminary injunction, the Company agreed to postpone implementing the Sucrose Letter policy until the Court could consider the questions involved, and the unamended bottlers agreed to waive damages pending disposition of the motion.

## II. PRELIMINARY INJUNCTION

The four-part standard for reviewing a preliminary injunction motion is familiar:

1) threat of irreparable harm to the moving party if the injunction is not granted;

---

1. The Sucrose Letter states:

On August 8, 1986, Judge Murray M. Schwartz issued an opinion and order in the case of *Coca-Cola Bottling Company of Elizabethtown, Inc., et al. v. The Coca-Cola Company,* 654 F.Supp. 1388 (1986), Civil Action No. 81–48–MMS, United States District Court for the District of Delaware.

Judge Schwartz's opinion and order dealt with two issues. One of these was the meaning of the word "sugar," as used in paragraph 10 of the 1921 Consent Decrees entered into between the Company and the parent bottlers. Judge Schwartz held that for the purposes of paragraph 10 of the Consent Decrees, sugar meant refined granulated sugar from cane or beet, i.e., sucrose, and accordingly that HFCS–55 was not sugar within the meaning of paragraph 10 of the Decrees.

The Company thereafter filed a motion to alter or amend the Court's opinion in certain respects. This motion was decided by Judge Schwartz on February 18, 1987. He adhered to his ruling that "sugar" as used in paragraph 10 of the Consent Decrees did not include HFCS–55.

The Company respectfully disagrees with Judge Schwartz's interpretation of the word "sugar" in the Consent Decrees and, if necessary, will appeal the ruling at an appropriate time. Nonetheless, the Company will begin to furnish to you Coca-Cola Bottle Syrup that is sweetened with sucrose.

Accordingly, I am writing to inform you that effective as of September 1, 1987, the Company will supply to your or your authorized

processor Coca-Cola Bottle Syrup that is sweetened 100% with sucrose. Thereafter, only Bottle Syrup sweetened with sucrose should be used in the production and sale of Coca-Cola in bottles and cans in your territory, unless you agree with the Company in writing on or before July 1, 1987 that you will accept HFCS–55 as "sugar" under the terms of your bottle contract and the Consent Decrees and that Bottle Syrup sweetened with HFCS–55 may be priced by the Company on the same terms as Bottle Syrup sweetened with sucrose.

Similarly, effective as of September 1, 1987, the syrups supplied to you or your authorized processor by the Company for the production of Coca-Cola classic, caffeine-free Coca-Cola, and cherry Coke, will be sweetened 100% with sucrose unless you agree with the Company in writing on or before July 1, 1987 that you will accept HFCS–55 as "sugar" and that syrups sweetened with HFCS–55 may be priced by the Company on the same terms as syrups sweetened with sucrose.

If you have any questions regarding the contents of this letter, please call me.

Sincerely,
/s/ Charles L. Wallace
Charles L. Wallace
Vice President

Plaintiffs' Motion for Preliminary Injunction, Dkt. 563, Exhibit A.

2) likelihood of success on the merits;

3) the possibility of harm to other interested persons from the grant or denial of the injunction;

4) the public interest.

*Sullivan v. City of Pittsburgh*, 811 F.2d 171, 181 (3d Cir.1987); *Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). The first two factors are the primary focus of the Court's review, and the moving party must demonstrate both are present to succeed. *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987); *In Re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).

**A. *Irreparable Injury***

The initial question concerning the Sucrose Letter policy is what degree of injury plaintiffs must show in order to secure equitable relief. In *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515 (3d Cir.1976), the Court of Appeals for the Third Circuit stated that "courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, 'peculiar.'" *Id.* at 527 (footnote omitted). That the potential harm is solely monetary does not necessarily foreclose a determination of irreparable injury. *See United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir.1979); *Northern Natural Gas Co. v. United States Department of Energy*, 464 F.Supp. 1145, 1158 (D.Del.1979). The threshold of "peculiarity" that the proposed action threatens must be high, because purely economic injuries are generally compensable and do

not require injunctive relief. *See Morton*, 822 F.2d at 372 (loss of income alone not irreparable injury); *Coca-Cola Bottling Co. of Shreveport v. The Coca-Cola Co. ("diet Coke")*, 563 F.Supp. 1122, 1141 (D.C. Del.1983) (loss of additional profits not irreparable harm).

In order to demonstrate the threatened injury is sufficiently peculiar, the plaintiffs must submit particularized proof of the direct harm to their operations caused by the Sucrose Letter policy. *Cf. A.O. Smith*, 530 F.2d at 529 (Adams, J., concurring) (record must show specifically the burden imposed on individual plaintiffs). Of the seventeen unamended bottler plaintiffs seeking the preliminary injunction, only twelve have submitted affidavits or have been deposed on the question of how their business will be harmed by the Company's proposed action.[2] Plaintiffs argue the proof submitted by the other bottlers is sufficient to show the type of injury sustained by all unamended bottlers, and therefore the generalized harm each will suffer is adequate proof of irreparable harm.

Plaintiffs' argument fails for two reasons. First, the alleged harm is purely economic, as the fundamental loss any bottler will sustain is the added cost of processing and shipping sucrose-sweetened Coca-Cola products. In order to show this monetary injury is peculiar, *individual* plaintiffs must demonstrate how each is particularly affected by the switch to sucrose syrup. Second, the plaintiffs are not similarly situated, and the harm sustained by one, *e.g.*,

---

**2.** The seventeen plaintiffs seeking injunctive relief are: Coca-Cola Bottling Co. of Magnolia, Sacramento Coca-Cola Bottling Co., Coca-Cola Bottling Co. of Elizabethtown, Coca-Cola Bottling Co. of Shelbyville, Trenton Coca-Cola Bottling Co., Kelford Coca-Cola Bottling Co., New Bern Coca-Cola Bottling Works, Plymouth Coca-Cola Bottling Co., Wilmington Coca-Cola Bottling Works, Inc., Coca-Cola Bottling Co. of Dickinson, Coca-Cola Bottling Co. of Jamestown, Coca-Cola Bottling Co. (Wiliston, ND), The Cleveland Coca-Cola Bottling Co., Coca-Cola Bottling Co. of Lehigh Valley, Inc., Laredo Coca-Cola Bottling Co., Coca-Cola Bottling Co. of Marshall (TX), and Central Coca-Cola Bottling Co. Dkt. 670. The five plaintiffs who have not submitted evidence of injury to their operations

are: Dickinson, Jamestown, Cleveland, Lehigh Valley, and Laredo. *Id.* Twelve plaintiffs have signed the 1978 Amendment, retaining only their claim for damages up through their agreeing to the Amendment but do not request injunctive relief. Those bottlers are: Coca-Cola Bottling Co. of Streator; Natchez Coca-Cola Bottling Co.; Coca-Cola Bottling Co. of Jefferson City; Coca-Cola Bottling Co. of Macon; Coca-Cola Bottling Co. of Deming; Coca-Cola Bottling Co. of Tulsa; Coca-Cola Bottling Co. of Brownsville; Coca-Cola Bottling Co. (San Angelo, TX); Las Cruces Coca-Cola Bottling Co.; Coca-Cola Bottling Co. of Tuscon; Coca-Cola Bottling Co. Inc. (Alexandria, MN); Texas Coca-Cola Bottling Co. *Id.*

having to seek out new processors, will not necessarily affect another in the same manner or to a similar degree. Plaintiffs' reliance on *Ft. Pitt Steel Casting* is misplaced because the potential injury there would affect each union member in a virtually identical way. The unamended bottlers affected by the Sucrose Letter represent the range of Coca-Cola bottler operations, from large packaging operations to small plants to bottlers who do none of their own bottling. Individualized proof of harm is the necessary prerequisite to the Court's considering a motion for a preliminary injunction where diverse plaintiffs allege an injury that is primarily economic in nature. *Cf. diet Coke*, 563 F.Supp. at 1141. Those plaintiffs failing to submit such proof cannot prove irreparable injury, and therefore the motion will be denied as to them.

Before analyzing the evidence of harm submitted by the twelve plaintiffs, a brief description of the bottling system is necessary to determine the effect of supplying syrup with different sweeteners to individual bottlers. Coca-Cola comes in a number of different packages, *e.g.*, 10–, 12–ounce and 16–ounce bottles, 12–ounce cans, and one-, two-, and three-liter plastic containers. The development of these varied packages dates back to the 1950's, and has accelerated greatly in the past decade. Moreover, since 1980, the Company has expanded the number of non-diet, sweetened products offered in the market from one, Coca-Cola, to four: new Coke, Coke Classic (the "original" formula), cherry Coke, and caffeine-free Coke. The unamended Bottler's Contracts require each bottler to invest in the necessary plant and equipment "sufficient to meet satisfactorily the demands of the business...." *See* PX 44, ¶ FOURTH(e) (standard unamended Bottler's Contract).

The proliferation of packages and products can create economic problems for bottlers, especially those with smaller territories, because their contracts prohibit transshipment of finished goods between territories and many cannot process all the packages. The Company authorizes the use of Temporary Processing Agreements that permit a bottler to contract with approved agency processors outside their territory for the packaging and delivery of the product.[3] Dkt. 608, Exhibit I. The agreements are for one year, and terminable on 60 days notice. Mr. Charles L. Wallace, manager of Franchise Affairs, stated during the hearing that the Company routinely authorizes the agreements and many bottlers have more than one such agreement in effect. Transcript of Preliminary Injunction Hearing ("P.I. Tr."), B–41–2. At present, approximately 21% of the entire sugar cola volume is processed under these agreements, and over 33% of the plaintiffs' products are packaged by agency processors.

Under the 1978 Amendment, the Company may offer amended bottlers concentrate rather than syrup for processing into fin-

---

**3.** The relevant portions of the Temporary Processing Agreement are as follows:

1. Company hereby authorizes Bottler to contract with the Processor(s) specified on Schedule A, attached hereto and made a part hereof, for the preparation and delivery of such Beverages in such package types and sizes as are designated therewith on Schedule A. Schedule A shall consist of one or more pages, each bearing the name of one Processor with the package type(s) and size(s) of Beverages which Processor may produce for Bottler. This authorization is limited to the conditions and terms specified herein and upon termination of this agreement for any reason, Bottler's existing obligation to meet satisfactorily the demand for the Beverages (but not necessarily by the use of any particular package type or size of the Beverages) in the Territory through its own processing facilities shall remain unimpaired and unmodified and shall continue in full force and effect.

2. Any and all pages of Schedule A may be cancelled by either party hereto upon sixty (60) days' written notice to the other. Additional pages will be added to Schedule A as mutually agreed upon by the parties hereto.

\* \* \* \* \* \*

5. This agreement shall continue in effect for one (1) year from the date first above written or until such earlier time as it shall be terminated at the will of either party upon giving of sixty (60) days' written notice to the other party, and to Processors then listed on Schedule A, except that this agreement shall terminate as to any brand of Beverage then designated on Schedule A upon termination for any reason of the Bottler's Contract covering that brand of Beverage.

Dkt. 608, Exhibit I.

ished products. The concentrate does not include the sweetener, which processors purchase on the open market. The Company authorizes five sweetener systems: 100% sucrose; 75% sucrose/25% HFCS; 50% sucrose/50% HFCS; 25% sucrose/75% HFCS; 100% HFCS. Affidavit of Charles L. Wallace ("Wallace Aff."), Dkt. 608, § 5. The vast majority of amended bottlers have chosen to receive concentrate, but unamended bottlers are only supplied with sweetened syrup. Under the Temporary Processing Agreements, the Company supplies the concentrate or syrup, depending on which product the bottler has contracted for, directly to the agency processor, who then packages and ships the packaged goods.

Since 1980, the Company furnished syrup with the same sweetener without reference to whether a bottler was amended or unamended. HFCS–55 was originally introduced in 1980 as a 50/50 blend with sucrose, and bottler operations began converting equipment to handle the new sweetener over a two-year period. *Id.* ¶ 10. By 1985, sufficient supplies of HFCS–55 were available to permit manufacturing of syrup sweetened with 100% HFCS–55. Affidavit of Dr. Anton Amon ("Amon Aff."), ¶ 3. At present, most bottling operations are equipped to handle HFCS–55, but according to the Company most of the equipment used for packaging syrup, as opposed to concentrate, can be used for bottling sucrose syrup. Amon Aff., ¶ 5; Affidavit of Charles R. Russell ("Russell Aff."), ¶ 4. Those processors presently unable to handle sucrose would have to purchase separate holding tanks, metering devices, create a separate receiving facility, and install ultraviolet sterilizing equipment. *Id.* ¶ 10. Independent of the possible need for larger physical facilities, a *syrup* processor could face an equipment investment of over $113,000, while *concentrate* operations would have to purchase over $176,000 of equipment in order to package products made with sucrose syrup. Affidavit of Timothy Exley ¶¶ 3–4. The Company estimates supplying sucrose syrup will increase its yearly costs anywhere from $3.9 million to $7 million, based on the price difference between sugar and HFCS–55 and the volume of sucrose syrup it must process, with the former figure more probable because of the decrease in the number of unamended bottlers. Amon Aff., ¶ 4.

The plaintiffs do not dispute the equipment costs described in the Company's affidavits, but assert that additional expenses will be incurred by unamended bottlers if they are forced to use sucrose syrup. The added costs processors will sustain may be passed on to the unamended bottlers, and for one group of bottlers, Wilmington, New Bern, and Kelford, that may amount to over 20¢ per case of Coca-Cola in cans. Affidavit of Connie Tyndall ("Tyndall Aff."), Dkt. 579, ¶ 5. Moreover, if new processors that can handle sucrose must be used, increased freight costs will be absorbed by the unamended bottlers. *See, e.g.,* Affidavit of Peter Trombley, Dkt. 586, ¶ 4 (if forced to use nearest unamended processor, 572 miles away, freight cost of $2 per case).

Plaintiffs do not rely solely on the possible increased equipment and freight costs because those are ascertainable monetary damages and cannot alone prove irreparable harm. The unamended bottlers point to two additional effects that allegedly constitute the requisite injury: first, the increased costs may severely damage their business, because the sugar cola market is so price competitive, and could even force them into bankruptcy. Second, plaintiffs face uncertain supplies of some packaged products because their agency processors cannot guarantee they will bottle sucrose-sweetened syrup. If certain packaged products are not available, then the bottlers will lose that share of the market and, more importantly, customer goodwill.

Plaintiffs' proof does not adequately demonstrate how the Sucrose Letter policy will threaten a peculiar injury, beyond mere potential economic losses. Some affidavits contain possible estimated costs for processing sucrose instead of HFCS–55, but these figures are not related to a bottler's profitability or market share figures. Plaintiffs essentially ask the Court to assume that, because their costs will be high-

er, they will suffer grave damage in light of present market conditions. The alleged threat of bankruptcy to some bottlers is also illusory, based on the plaintiffs' evidence, because there has been no showing that the increased costs will completely eliminate a bottler's ability to compete.

■ Much of the plaintiffs' cost estimates, especially those related to increased freight charges, are built on two assumptions: first, amended bottlers processing for the plaintiffs will not continue to supply packaged products with sucrose syrup, thereby forcing those bottlers to purchase *only* from another unamended bottler; second, plaintiffs processing for amended bottlers will lose that business because of the increased cost of processing sucrose syrup. The first assumption is not supported by the plaintiffs' affidavits, and is contradicted to a degree by agency processors affidavits introduced by the Company. A number of plaintiffs state their processors cannot "guarantee" continued production, and that future processing may be more expensive, but only one can state its processor will not handle sucrose. Affidavit of Teresa K. Cote, Dkt. 588, ¶ 4. Two agency processors that package HFCS–55 products have stated their willingness to handle sucrose, and one, Great Lakes Canning, Inc., estimates an increased cost per case of 3.1¢ for sucrose syrup. Affidavit of B.E. Nordielm, Dkt. 608, ¶ 5; Affidavit of Kenneth Abbott, Dkt. 608, ¶ 3. Plaintiffs cannot show their potential losses, if any, are anything more than speculative because there is no basis to assume the processing agreements will be terminated. To prove irreparable harm each bottler must show a particularized injury beyond simply the possibility of increased costs. The individual bottlers have not met this burden.

Those plaintiffs who assert they will lose amended bottler processing agreements, thereby greatly harming their business, have not submitted evidence to show how an increase in costs will cause a loss of business. For example, William B. Schmidt, president of the Elizabethtown bottler, states the Sucrose Letter policy may cause Elizabethtown to lose both the Coca-Cola and other soft drink product packaging business of amended bottlers, which constitutes 50% of the volume. Affidavit of William B. Schmidt, Dkt. 589, ¶ 14. There is no testimony, however, on why this result will occur if sucrose syrup is supplied, or how the added costs will necessarily cause the loss of 50% of Elizabethtown's volume. Mere assertions of dire economic effects cannot, without some concrete proof, meet the irreparable harm standard.

Plaintiffs also rely on a statement made in an internal Company memorandum analyzing the agency processing interrelationship between amended and nonamended bottlers to show the injurious effect of the Sucrose Letter. The memorandum was written by Mr. Richard L. Burns, manager of the Contractual Affairs. Burns stated that the effect of the Sucrose Letter on unamended processors would be to "lose this amended RB business because these RB's would then be buying 100% sucrose syrup from the company through the processor." At the hearing, Burns testified his memorandum was incorrect because he mistakenly assumed the Sucrose Letter meant unamended processors could not receive HFCS syrup for their amended customers. The memorandum's mistaken statement concerning the loss of amended bottler processing agreements cannot support the plaintiffs' assertion that they will necessarily lose all or a substantial portion of their business because of the Sucrose Letter policy.

The additional costs unamended processors may bear will have a negative effect because they will have to purchase new equipment and perhaps expand their facilities, plus the possible loss of some business through increased processing costs. The evidence, however, does not support a finding of irreparable harm because neither the degree nor the likelihood of loss caused by the Sucrose Letter is ascertainable from the record. There is no basis to assume an unamended processor will lose the business of all amended bottlers, and those plaintiffs' asserted losses based on that assumption cannot make out

the peculiar injury necessary for injunctive relief.

The plaintiffs also rely on evidence of the number of unamended bottlers who signed the 1978 and 1983 Amendments after the Company sent the Sucrose Letter to show that the remaining plaintiffs will be irreparably harmed if they receive only sucrose syrup. As of April 1, 1987, 64 bottlers had not signed the Amendments, but within the next month 35 unamended bottlers signed. P.I. Tr. A–170–75. Plaintiffs seem to assert that the *in terrorem* effect of the Sucrose Letter, as demonstrated by the number of bottlers that "folded" in the face of the Company's pressure, conclusively proves they will be irreparably harmed in their business operations.[4] The Company presented the unamended bottlers with a tough decision, but the remaining plaintiffs' decision not to sign does not mean they will suffer any peculiar injury.

The unamended bottlers had a choice regarding which course they would follow after the Sucrose Letter: sign the amendments, elect HFCS–55 and waive any *future* damages, or receive sucrose syrup and maintain their claims. Each option had benefits and burdens, but every business decision entails a balancing process. Plaintiffs continue to have the option to waive their future damage claims and receive HFCS–55 syrup, with the continued operation of the price clause of their unamended contracts. The plaintiffs' choice to not waive their claims or sign the amendments will force them to suffer increased costs, but with the potential for future gains by maintaining their claims. The unamended bottlers had three viable courses of action before them, and the choice of some bottlers to sign the Amendments does not demonstrate the Company's decision to supply sucrose syrup will cause irreparable harm. Moreover, the remaining plaintiffs presently have a *choice* between receiving HFCS–55 or retaining their claims, and if one option has costs too great to bear then the alternative can be chosen. Although plaintiffs seek to characterize the Sucrose Letter as a "Sword of Damocles," their decision to pursue a course of action when viable alternatives remain cannot then form the basis of an assertion that they will be irreparably harmed by their choice.

Plaintiffs have failed to provide adequate proof, beyond merely conclusory statements or speculation, that the implementation of the Sucrose Letter policy will irreparably harm them. Even if the record contained sufficient evidence of the costs and effects on particular bottlers, plaintiffs have chosen to bear the burden of receiving sucrose syrup in order to retain their damage claim, thus rejecting other less costly alternatives. The heart of this litigation is whether the unamended bottlers or the Company will reap the benefits from use of the lower cost sweetener. The bottlers' position is similar to that faced by plaintiffs in the *diet Coke* litigation, in that the alleged harm is loss of an economic advantage. *See* 563 F.Supp. at 1141 (irretrievable loss of additional profits is not irreparable harm). The "harm" caused by the Company's decision will be merely economic, and the product of a business decision by the plaintiffs. As such, the cost of their decision cannot constitute the "peculiar injury" necessary for a preliminary injunction.

Plaintiffs' failure to establish irreparable injury would be sufficient to deny their motion. However, the Court will consider whether plaintiffs would be likely to succeed on the merits of their claim as an alternative ground for decision on the motion.

---

4. The plaintiffs submitted the affidavit of Frank W. Troup, President of the Decatur Coca-Cola Bottling Co., Inc., who signed the 1978 and 1983 amendments after receiving the Sucrose Letter. Mr. Troup outlined his perception of the threat posed by the Company's new policy:

Because of these economic threats to its business, Decatur felt compelled to take whatever steps demanded by The Coca-Cola Company that were necessary to keep Decatur in business and operating competitively, and therefore felt it necessary to amend its contract and release its claim against the Company, thus ensuring a continued source of supply of Coca-Cola products from Huntsville at a price at which Decatur could compete and operate profitably.

Dkt. 586, ¶ 8.

## B. *Success on the Merits*

In order to secure preliminary relief, the moving party has the burden of proving it has a *reasonable probability* of ultimately succeeding on the merits of the claim. *In Re Arthur Treacher's Franchisee Litigation*, 689 F.2d at 1147. The plaintiffs argue two grounds for grant of the preliminary injunction: first, the Company has materially breached a term of the Bottler's Contracts and Consent Decrees, and because syrup is a unique good, the unamended bottlers are entitled to a decree of specific performance; second, the Company has breached the implied contractual duty of good faith by effectively forcing the plaintiffs to accept HFCS–55 and waive their claims, or suffer severe economic harm by receiving sucrose syrup. The Court will review each asserted breach to determine whether plaintiffs have carried their burden.[5]

### 1. *Breach of Contract*

Plaintiffs argue that providing them with sucrose syrup when all other amended bottlers receive HFCS–55 syrup constitutes a breach of contract because the Company is not furnishing *"standard* Bottlers Coca-Cola Syrup." The term "standard" does not appear in the unamended contacts, but plaintiffs assert the assignment of rights from the original parent bottlers[6] to the first-line bottlers under their contracts included the provision in paragraph 10 of the Consent Decrees that they receive the "standard Bottlers Coca-Cola Syrup" the Company was required to supply to parent bottlers.

In *Coke IV*, the Court held that only a limited number of plaintiffs, specifically those unamended bottlers from the Whitehead-Lupton territory in existence at the time of the Consent Decrees and their successors and assigns, could sue for a breach of the Consent Decrees. 654 F.Supp. at 1436–37. None of the present plaintiffs existed in 1921, when the Consent Decrees were signed, and only six are arguably successors and assigns with standing to enforce the Consent Decrees.[7] Plaintiffs present a broader argument, however, applicable to all unamended bottlers, based on an assignment of rights under paragraph 10 of the Consent Decrees. This assignment theory incorporates the question of how the Consent Decrees are to be interpreted and their effect on the Bottler's Contracts, and therefore the court need not consider the separate question of which plaintiffs have standing to sue for breach of the Consent Decrees.

The Court has previously determined that there is a close nexus between the Consent Decrees and the individual Bottler's Contracts. *Coke II*, 98 F.R.D. 254, 267 (D.Del.1983). Both the Consent Decrees and the Bottler's Contracts use the term "syrup," and the parent bottlers assigned to the first-line bottlers the right to receive "sufficient syrup for bottling purposes to meet the requirements of [first-line bottlers], provided, [parent bottlers] can obtain the delivery to it of such syrup from the Coca-Cola Company under the contract existing between [parent bottlers] and the Coca-Cola Company...." *Coke IV*, 654 F.Supp. at 1440 n. 21. Paragraph 10 of the Consent Decrees provides:

---

5. Plaintiffs allege in their brief that the Company breached the duty to promote Coca-Cola products under the Bottler's Contracts, but have not pursued this position further. They did not argue this issue at oral argument, and the Court will not treat this question in considering the present motion.

6. The Coca-Cola bottling system evolved in a three-tiered structure: the Company, the parent bottlers, and the first-line bottlers. The Company and parent bottlers were governed by the Consent Decrees after 1921. In 1934 and 1975 the Company bought out the parents. The original Bottler's Contracts were between the parent

and first-line bottlers, and reflected the provisions of the Consent Decrees. For a general description of the Coca-Cola bottling system and the historical relationship between the parties, see *Coke II*, 98 F.R.D. at 258–61; *Coke IV*, 654 F.Supp. at 1430–37.

7. The six plaintiffs from the former Whitehead-Lupton territory who may have standing as successors and assigns are Dickinson, Jamestown, Trenton, Magnolia, Marshall, and Laredo. Dkt. 670. Defendant argues these bottlers cannot prove their status because of transactions subsequent to the entry of the Consent Decrees.

10. The party of the second part [The Coca-Cola Company] contracts that the syrup sold and furnished by it to the party of the first part [the parent bottler] is to be high grade *standard* Bottlers Coca-Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

*Id.* at 1424 n. 2 (emphasis added).

■ Although the Court has held the limited assignment of Consent Decree rights from the parents to the first-line bottlers does not give the unamended bottlers standing to sue to enforce the Consent Decrees, that assignment does directly affect the parties' rights under the Bottler's Contract. *Id.* at 1442 n. 22. The "syrup" first-line bottlers receive cannot be different from that which the Company bound itself to deliver under the Consent Decrees. The Bottler's Contract does not define the meaning "syrup," or specify what type of syrup the first-line bottlers will receive. Reading the contract together with the Consent Decrees, however, shows that the parent bottlers would take the "standard Bottlers Coca-Cola Syrup" provided under the latter and supply it according to the duties imposed by the Bottler's contracts. Any other interpretation of the term "syrup" would be meaningless. The Court finds it is more likely the right to receive "syrup" assigned to the unamended bottlers includes the right to receive "standard Bottlers Coca-Cola Syrup" under Paragraph 10 of the Consent Decrees.[8]

Given the more probable interpretation of plaintiffs' right to receive "standard" syrup under the unamended contracts, they argue that, if the Company supplies sucrose syrup while furnishing the amended bottlers with HFCS–55 syrup, the contract is breached because HFCS–55 syrup has become the "standard" syrup. The legal foundation for the plaintiffs' position is unclear because they have not stated how HFCS–55 syrup became the *only* standard

syrup, and how "standard" is to be interpreted in light of the Consent decrees, where the term originates.

Paragraph 10 of the Consent Decree provides not only for "standard Bottlers Coca-Cola Syrup," but goes on to state that it "shall contain not less than five and thirty two one-hundredths (5.32) pounds of *sugar* to each gallon of syrup." (emphasis added). In reviewing the meaning of sugar, including contemporaneous usage and course of performance evidence, the Court found it means "refined granulated sucrose from cane or beet, a definition that excludes HFCS–55." *Coke III,* 654 F.Supp at 1406. The term "standard" cannot stand alone, but must be viewed in the context of the parties to the Consent Decree specifically mandating "sugar" in the syrup. The parent bottlers and the Company required the use of sugar as both a quality control and price-protecting provision in the Consent Decrees. *Id.* at 1402. The particular sweetener added to the syrup is an express duty imposed on the Company.

The more probable interpretation of the Bottler's Contracts is that the syrup the parent bottlers assigned the right to receive to the first-line bottlers includes the contents agreed to in the Consent Decrees, *i.e.,* sucrose from cane or beet. The Company's decision to supply sucrose syrup comports with the requirement of the contract and the rights assigned to the unamended bottlers because at a *minimum* the Consent Decree permits the Company to use sucrose as the sweetener. Whether the Company may, under the Bottler's Contract, provide any other sweetener beyond beet or cane sugar is an issue not presently before the Court.

Plaintiffs argue the course of performance since 1980, when HFCS–55 was first introduced, and the continued supply of HFCS–55 syrup to amended bottlers, who constitute 97% of the bottling system, demonstrates that only one sweetened syrup

---

**8.** Plaintiffs point out that two bottlers, Sacramento and Trenton, surrendered their old contracts and presently operate under 0555 Form Contracts, entered into directly with the Company. There is a question whether those contracts include any assignment of Consent Decree rights, including the right to receive "standard" syrup. The Court will assume these bottlers have rights identical to other plaintiffs for the purpose of deciding this motion.

constitutes "standard" syrup: HFCS–55 syrup. The argument, however, succumbs to two flaws. First, the amended bottlers operate under a contract different from the plaintiffs, the 1978 Amendment, which permits the Company to supply HFCS–55 syrup. How the Company acts under separate, amended contracts does not affect the interpretation of the unamended contracts because the sole concern is how the *parties* to the disputed agreement have acted. The different agreements the Company has with the amended and unamended bottlers means a common course of action may be permissible under one contract and not the other, but each course of performance must be reviewed separately.

■ Second, course of performance evidence may be given great weight in interpreting a contract where the parties know of the particular acts and either accept or acquiesce without objection to the performance. *Restatement (Second) of Contracts* § 202(4); *see Coke IV*, 654 F.Supp. at 1429. The unamended bottlers' original complaint in this action signalled their clear objection to the use of HFCS–55 as a substitute for sugar. In Counts I and II of the complaint, the plaintiffs requested the following relief:

(a) That the Court enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 determining that:

(1) The Coca-Cola Company is obligated under the terms of paragraph 10 of the 1921 Final Decrees entered by the United States District Court for the District of Delaware and under the terms of the first-line bottlers' contracts to supply the plaintiff and members of the class of Unamended bottlers "high grade standard Bottlers Coca-Cola Syrup that shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

(2) The substitution by The Coca-Cola Company of HFCS 55 for the sugar formerly used to manufacture Coca-Cola Bottlers' Syrup sold to plaintiff and members of the plaintiff class, without their consent, constitutes a material breach of (A) the 1921 Final Decrees, and (B) the plaintiff's and each class member's first-line bottler's contract.

\* \* \* \* \* \*

(b) That the Court enter a preliminary and a permanent injunction and enjoining The Coca-Cola Company from violating the 1907 Agreement, the 1921 Final Decrees, and the first-line bottlers' contracts of the plaintiff and members of the class, by supplying, without the consent of the plaintiff and each Unamended Bottler, Coca-Cola Bottlers' Syrup made with HFCS 55, and refusing to supply plaintiff and members of the class their requirements of "high grade standard Coca-Cola Bottlers Syrup that contains not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

Dkt. 1, ¶¶ 49, 53. Plaintiffs also requested other relief, including a pass-through of any savings the Company realized from the use of HFCS–55. *See infra*, Section III. The complaint, however, specifically requests the Court find the Company in breach of contract by supplying HFCS–55, and is clear evidence that the plaintiffs did not accept or acquiesce in the course of performance since 1980. While plaintiffs may file an amended and supplemental complaint which omits any claim to receive sucrose syrup, they cannot now assert they willingly accepted HFCS–55 syrup and never truly objected to the Company's action.

Plaintiffs' breach of contract argument is not likely to succeed in light of the terms of the Consent Decrees that "standard Bottlers Coca-Cola Syrup" include sugar and their objection to HFCS–55 as a sweetener substitute when the Company first introduced it. The unamended bottlers' probability of success in proving the Company will breach the Bottler's Contract by providing sucrose syrup is at best minimal, and by no means satisfies the "reasonable probability of success on the merits" criterion essential to grant of a preliminary injunction.

## 2. *Duty of Good Faith*

■ Plaintiffs argue the Company's withdrawal of the 1978 and 1983 Amendments and then sending the Sucrose Letter evidence bad faith because the Company is applying coercive measures to force the unamended bottlers to drop their claims or undergo severe economic hardship. The duty of good faith is a contract term implied by courts under the common law to prevent one party from unfairly taking advantage of the other party. The Restatement applies the term in every contract, *Restatement (Second) of Contracts* § 205, and the duty requires a party to avoid hindering or preventing the other party's performance. *See* E. Fransworth *Contracts* § 7.17 (1982). The Uniform Commercial Code (UCC) similarly imposes the duty on parties whose contracts are governed by its provisions. UCC § 1–203. The type of conduct circumscribed by the duty is not clear, however, and courts have no articulated standards that are much more than conclusory assessments of how the parties acted.

■ The initial problem in determining whether the plaintiffs can demonstrate a breach of the duty is whether the term can be implied under the state law applicable to each separate unamended contract. This is a diversity action, and therefore the choice of law rules and substantive law of contracts will depend on state law. *See Coke II*, 98 F.R.D. at 266 (contracts of each bottler do not appear to be governed by the law of any one state). Delaware's choice of law standard applies the principle stated in *Restatement (Second) Conflicts of Law* § 188 (1971), that the law of the state with the most significant relationship to the transaction governs. *Id.* (citing *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160 (Del.1978)); *see Johnston Associates, Inc. v. Rohm and Haas, Co.*, 560 F.Supp. 916, 917 (D.Del.1983).

Plaintiffs claim the bottler's principal place of business is the state with the most significant interest. The Company does not directly dispute this, but argues the plaintiffs have not placed sufficient evidence in the record to demonstrate where the bottlers have their principal place of business in a specific state. For example, one bottler has territories in four states, but there is no evidence which state is its primary business location. Plaintiffs did not respond in their reply brief by pointing out any evidence in the record which would show a bottlers' principal place of business. The unamended bottlers' failure to produce this evidence could prevent the Court from ruling on their motion because the likelihood of success on the merits under the applicable state law cannot be ascertained. Given the time constraints under which the parties operated, and the complexity of the issues presented by the motion, the Court will accept plaintiffs representations concerning the location of their businesses for the purposes of deciding the motion.

According to plaintiffs, their principal places of business are in the following states: Arkansas, California, Kentucky, Missouri, North Carolina, North Dakota, Ohio, Pennsylvania, Texas, and Virginia.[9] Plaintiffs' Post-Argument Brief in Support of their Motion for Preliminary Injunction, Dkt. 675, at 17. Two bottlers have contracts governed by the UCC, Cleveland and Sacramento, and therefore the duty of good faith automatically attaches to those contracts under § 1–203. The Court's review of the law in the other states reveals that six have directly or indirectly recognized an implied duty of good faith as a term in all contracts: *Richard Short Oil Co. v. Texaco, Inc.*, 799 F.2d 415 (8th Cir. 1986) (Arkansas) (circuit court assumes state would imply duty); *Hornung v. NCAA*, — S.E.2d — 85–CA–3178–MR (Ky.Ct.App. July 17, 1987) (Kentucky) (expressly finding duty); *Faust & Forden, Inc. v. Greenbaum*, 421 S.W.2d 809 (Mo. 1967) (Missouri)

---

**9.** The plaintiffs and the state whose law applies to each are as follows: Magnolia (*Arkansas*); Sacramento (*California*); Elizabethtown and Shelbyville (*Kentucky*); Trenton (*Missouri*); Wilmington, New Bern, Kelford and Plymouth (*North Carolina*); Williston, Dickinson and Jamestown (*North Dakota*); Cleveland (*Ohio*); Lehigh Valley (*Pennsylvania*); Marshall and Laredo (*Texas*); Central (*Virginia*).

(same); *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.,* 253 S.E.2d 625 (N.C.Ct. App.1979) (North Carolina) (same); *Ireland v. Charlesworth,* 98 N.W.2d 224 (N.D.1959) (North Dakota) (implicitly recognizing duty); *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978) (Pennsylvania) (same); *see generally* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L.Rev. 369, 404 (1980) (listing states recognizing duty of good faith in all contracts). Virginia and Texas have not recognized the implied contractual duty.

The Virginia courts have not addressed the issue under the common law. The United States Court of Appeals for the District of Columbia Circuit did consider a diversity claim under Virginia law that alleged a breach of the duty of good faith in *Tymshare, Inc. v. Cavell,* 727 F.2d 1145 (D.C.Cir.1984). The court stated that it would not "speculate" on whether the Virginia Supreme Court would adopt the doctrine of good faith, *id.* at 1152, but went on to analyze the claim as if the duty did attach to the contract. *See id.* at 1153 ("Whether pursued under the rubric of 'good faith' or the more traditional rubric (for most contracts) of 'implied limitation,' our inquiry...."). Although not conclusive authority for whether Virginia would simply the duty in all contracts, the Court will assume on the basis of *Tymshare, Inc.* that Virginia would recognize the duty as attaching to the unamended bottler's Contract for the purpose of this motion.

The Texas Supreme Court has considered the question, and explicitly rejected the implied covenant of good faith as "contrary to our well-reasoned and long-established adversary system which has served us ably in Texas for almost a hundred fifty years." *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983). In *Exxon Corp. v. Atlantic Richfield Co.,* the Texas Supreme Court reaffirmed *English,* stating:

There can be no implied covenant as to a matter specifically covered by the written terms of the contract. The agreement made by the parties and embodied in the contract itself cannot be varied by an implied good-faith-and-fair-dealing covenent.

678 S.W.2d 944, 947 (Tex.1984) (citations omitted); *see Aranda v. Insurance Co. of North America,* 722 S.W.2d 755 (Tex.Ct. App.1986) (citing *English,* refusing to find implied duty for workers compensation program). The Texas Supreme Court has recently found an exception to its rule against implying the duty where the alleged breach is of an insurance contract. *Arnold v. National County Mutual Fire Insurance Co.,* 725 S.W.2d 165 (Tex.1987). The court stated,

while this court has declined to impose an implied covenant of good faith and fair dealing in every contract, we have recognized that a duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a contract.

*Id.* at 167; *see Douglas v. Aztec Petroleum Corp.,* 695 S.W.2d 312 (Tex.Civ.App.1985) (finding duty where special relationship arises under agency agreement).

■ The thrust of Texas law, as enunciated by the Texas Supreme Court, is clear that the duty will be imposed in only limited circumstances. Moreover, the presence of a contractual relationship, standing alone, does not appear sufficient to constitute the special relationship described in *Arnold.* Therefore, the Court finds the unamended Bottler's Contracts of Marshall and Laredo, both governed by Texas law, most likely may not claim a breach by the Company the state's law does not imply the covenant of good faith.

The duty of good faith and fair dealing is a means by which courts may interpret the terms of the contract to effectuate the parties' intentions.[10] The focus on intent is problematic, however, because the language of an agreement will rarely cover most circumstances that will occur during performance, especially where one party

---

**10.** The analysis of the duty of good faith and fair dealing under the common law is virtually indistinguishable from that under UCC § 2–103, and the Court will analyze all contracts incorporating the duty identically.

has discretion in the manner of complying with the contract terms. The tension that has arisen in judicial interpretations of the duty is reconciling a party's performance under an express term of the contract with the question of whether that performance can be adjudged to be in "good faith."

The Company relies on a number of cases which express the principle that an implied duty of good faith cannot override or contradict an express term of the contract. *See Triangle Mining Co., Inc. v. Stauffer Chemical Co.*, 753 F.2d 734, 739 (9th Cir.1985) (common law duty of good faith cannot alter unambiguous contract term); *Grand Light & Supply Co. Inc. v. Honeywell, Inc.*, 771 F.2d 672, 679 (2d Cir. 1985) (UCC § 10293 cannot override explicit contractual term); *Cardinal Stone Co., Inc. v. Rival Manufacturing Co.*, 669 F.2d 395, 396 (6th Cir.1982) (same); *Broad v. Rockwell International Corp.*, 642 F.2d 929, 957 (5th Cir.1981) (same). The majority of cases that state this holding have involved termination clauses, and the courts' initial step has been to find the term unambiguous. In an extensive analysis of the duty of good faith, then-Circuit Judge Scalia pointed out that the "trick" is finding a contract power express and unambiguous, "and surely the *mere recitation* of an express power is not always the test." *Tymshare, Inc.*, 727 F.2d at 1153 (emphasis added).

Both the UCC and the states which imply the duty under the common law attach the term to every contract, whether it contains express powers or not. The proper anaysis is whether a party's performance that is expressly permitted or even required by the contract can ever constitute bad faith. Where the term is ambiguous or the proposed action is not directly covered by the provisions, then the implied duty of good faith will supply the necessary term or limitation. On the other hand, if an express power or duty is written into a contract, then it will be much more difficult to prove bad faith because the parties intended the act to take place. It is possible, however, that the exercise of an express power would constitute a breach of the duty of good faith if the external circumstances demonstrate, for example, overreaching or undue interference in the other party's performance.

The bad faith that plaintiffs argue breaches the duty is the Company's motivation for withdrawing the 1978 and 1983 Amendments and sending the Sucrose Letter. According to plaintiffs, the timing of the Sucrose Letter has the effect of forcing unamended bottlers to choose the Amendments, waive their claims for future damages by electing to receive HFCS–55 syrup under the contract price formula, or undergo the economic hardship of processing sucrose syrup. Plaintiffs argue all of these options will effectively terminate the litigation and permit the Company to operate as it has in supplying HFCS–55 syrup without ever having to address the merits of plaintiffs' breach of contract claims. It is the avoidance of the litigation that is the heart of the alleged bad faith.

The Sucrose Letter policy will cost the Company nearly $4 million if it is implemented. Moreover, the savings achieved by the Company by supplying HFCS–55 syrup to unamended bottlers while charging the higher contract price will be lost once the Company commences its sucrose purchases; sugar refiners, not the unamended bottlers or the Company, will gain the benefit. The plaintiffs point to an internal Company memorandum stating that the January 6 Amendment withdrawal letter has the bottlers "thinking," and that the Sucrose Letter may encourage settlement or persuade bottlers to waive future damages and accept HFCS–55. PX 1–P.I. Plaintiffs argue that, when looked at as a whole, the Company's willingness to sustain a noncompensible loss in order to diminish the number of litigating unamended bottlers is clear evidence of bad faith. Rather than being a simple business decision, plaintiffs assert the Sucrose Letter is the culmination of a coercive effort to force an end to the litigation, a wholly illegitimate goal.

The Company characterizes its actions as a straightforward business decision in light of the Court's rejection of their motion to

amend the definition of "sugar" in *Coke IV*. Defendant argues that it is now complying with the Court's decision by resuming production of sucrose syrup, and that the Sucrose Letter is an effort to "cap" the damages caused by any possible breach by requiring unamended bottlers to waive their future claims if they wish to receive HFCS–55 syrup. The Company also claims the January 6 Amendment withdrawal letter was not directly related to the Sucrose Letter, as the earlier communication reflected the Company's desire to end the amendment process after the offer had been open a number of years.

The Court heard two days of testimony on the decision to send the Sucrose Letter, including an extensive examination a Mr. Charles Wallace, a key participant in the decision. In addition, internal memoranda outlining the background and goals of the Sucrose Letter have been thoroughly reviewed. In weighing the testimony and documents, the Court finds the January 6 letter and the Sucrose Letter were directly related and designed to limit the number of plaintiffs with claims for future damages. The combined effect of the communications, reducing the number of unamended bottlers by 35 within a short period after the Sucrose Letter, supports this conclusion.

The fundamental question is whether this motivation to reduce the number of unamended bottler claims constitutes a breach of the duty of good faith. The presence of important business considerations in reaching the decision does not automatically insulate the Company from a finding of bad faith. The Court's earlier review of whether supplying sucrose syrup breaches the unamended contracts, however, shows the defendant's actions were most likely within the express provisions of the Consent Decrees and Bottler's Contracts. In addition, the Company had discretion to withdraw its offer of the Amendments. Neither act contravened the contracts, nor are they in themselves evidence of bad faith.

▉ Plaintiffs' argument rests on an assessment of the Company's motivation

because defendant admits its actions were designed to end, or at least limit the future consequences of the litigation. *See* P.I. Tr. A–182–85; PX 1–P.I. The line between a hardnosed business decision and a bad faith act in breach of contract is never clear. Based on the evidence produced by plaintiffs, however, it is doubtful they can prove bad faith where the Company's acts are most likely legitimate exercises of its contractual power. A business decision has attendant costs, and here the Company faced the choice of allowing a number of claims for future damages to continue or making the expenditure to produce sucrose syrup coupled with a means of limiting those damage claims. The plaintiffs characterize the Company's actions as "coercive" and "extortion," but fail to note the reasonable options available to them when the Sucrose Letter was sent. The Company has forced the unamended bottlers into making an unpleasant decision, but it is doubtful whether this constitutes bad faith in brach of the Bottler's Contracts.

The implied duty of good faith requires the parties to act reasonably in their performance, but it does not eliminate the risks accompanying any business transaction. In light of the reasonable probability the Company can supply sucrose syrup under the unamended contract, the means chosen to contain the costs of this litigation were not unjust or inequitable. The analysis of irreparable harm, *supra*, shows the plaintiffs may suffer economic losses from their choice, but they will be able to continue their operations. The Court holds the plaintiffs have not shown there is a reasonable likelihood they will succeed on the merits of the claim of a breach of the implied contractual duty of good faith.

### III. MOTION TO AMEND

Plaintiffs filed a motion to amend Count I of their complaint and to file a supplemental pleading as Count II, under Federal Rules of Civil Procedure 15(a) and (d). Rule 15(a) permits amendment by leave of the court, and it "shall be freely given when justice so requires." A supplemental pleading is allowed where it states a claim

arising from "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."

In amended Count I, plaintiffs seek to clarify the relief requested from the Company's alleged breach of the Consent Decrees and Bottler's Contracts. In their original complaint, plaintiffs sought a declaratory judgment that the substitution of HFCS–55 constituted a breach, an injunction halting the use of HFCS–55 syrup, and as alternative relief requested damages in the form of a pass-through of the price difference between sugar and HFCS–55 for each gallon of syrup. Dkt. 1, ¶ 49. The bottlers have dropped their request that the Court order the Company to supply sucrose syrup and now limit the requested relief to the savings pass-through. In addition, plaintiffs have added a request for an injunction directing the Company to supply them with concentrate rather than syrup in order to place the unamended bottlers on an equal footing with the amended bottlers.

 Rule 15(a) must be interpreted liberally, and amendments will be permitted absent undue delay, bad faith, or prejudice to the opposing party. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Defendant first argues the six and one-half year delay in filing the amendment is "undue," and that it will be prejudiced by the additional claims for relief raised in amended Count I. The Third Circuit Court of Appeals has stated, "The mere passage of time, without more, does not require that a motion to amend a complaint be denied...." *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir. 1984). There is no evidence of bad faith or dilatory tactics on the plaintiffs' part in waiting to file the amendment. They have *not* raised matters left out of their first complaint, but only clarified the type of relief sought. *See J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 615 (3d Cir.1987). The long process involved in this litigation has finally brought plaintiffs' primary claim for relief to the forefront, and the delay cannot be traced to any intentional or negligent conduct on their part.

The prejudice alleged by the Company revolves around the additional discovery it asserts will be necessary if the motion is granted. The short answer is that the original complaint clearly stated a claim for a savings pass-through, albeit as an alternative ground of recovery. If defendant chose not to pursue discovery on the issue, it cannot now assert prejudice or claim it could not have pursued relevant evidence earlier. The request for an injunction requiring the Company supply concentrate only raises a new form of relief, and the underlying claims remain exactly the same. It is unclear what additional discovery, if any, would be necessary if the motion is granted. Conclusory allegations of "prejudice" will not suffice to defeat an amendment under Rule 15(a)'s liberal policies.

The matters raised in the supplemental pleading as Count II allege an additional breach of the Consent Decrees and Bottler's Contracts based on the Company's decision in March, 1987 to supply sucrose syrup to unamended bottlers. The theory of Count II is essentially the same as that raised in the plaintiffs' motion for a preliminary injunction, that HFCS–55 syrup is "standard Bottlers Coca-Cola Syrup," not sucrose syrup, and the threatened action breaches the implied duty of good faith. The plaintiffs seek injunctive relief to continue the supply of HFCS–55 syrup and request punitive damages and attorneys fees.

 Parties are permitted to state new claims in supplemental pleadings so long as the transaction or occurrence took place after the filing of the complaint and the new cause of action is related to the original claims. *See Soler v. G & U, Inc.,* 103 F.R.D. 69, 75 (S.D.N.Y.1984). "The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1057 (9th Cir. 1981). Plaintiffs' new claim obviously arose after the original pleading, and is directly related to those original claims be-

**923**

cause the Company's asserted reason for sending the Sucrose Letter was in response to the plaintiffs' suit. Under Rule 15(d), leave to file a supplemental complaint rests within the court's discretion. *Coke II,* 98 F.R.D. at 276.

Defendant makes two arguments why the supplemental pleading should not be permitted. First, the Company argues plaintiffs have unduly delayed filing the supplemental pleading and that it will be prejudiced because of the extensive discovery necessary to address the claim. The plaintiffs filed their motion a little more than two months after the transaction giving rise to supplemental Count II, *i.e.,* the Sucrose Letter sent on March 16, 1987. Plaintiffs' motion was timely. The discovery necessary to respond to the claim may be extensive, but it is a direct result of the defendant's alleged breach of the unamended contracts and Consent Decrees. Plaintiffs have adequately stated a claim for relief in the supplemental complaint, and the necessity for further discovery does not constitute prejudice where the new claim is related to the defendant's earlier actions.

Defendant's second argument is equally unavailing. The Company asserts the plaintiffs should be foreclosed under the doctrine of "judicial estoppel" from bringing the supplemental claim. In essence, the defendant argues the new claim requesting an injunction requiring the continued supply of HFCS–55 syrup contradicts the plaintiffs' original allegation of breach based on the substitution of HFCS–55 for sugar in 1980. Judicial estoppel applies where "[a] plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." *Scarano v. Central Railroad Co. of New Jersey,* 203 F.2d 510, 513 (3d Cir.1953). A prerequisite for applying the doctrine is that a party have *"successfully* and unequivocally asserted a [inconsistent] position in a prior proceeding." *Edwards v.*

*Aetna Life Insurance Co.,* 690 F.2d 595, 598 (6th Cir.1982) (emphasis added).

Plaintiffs have not, to date, successfully asserted a claim that contradicts the supplemental pleading. The decision in *Coke III* adopted the unamended bottlers position on the definition of "sugar," but that was solely the resolution of a preliminary issue related to contract interpretation and not a final adjudication on the merits of plaintiffs' claims. Moreover, the new claims arise out of a subsequent transaction, and allege a distinct breach of the Consent Decrees and Bottler's Contracts. Without considering the merits of any of the claims, the original complaint is based on a breach of the pricing provision of the Consent Decrees and Bottler's Contracts while the supplemental pleading concerns the "standard" syrup provision.

Similar to motions to amend, requests to supplement pleadings should be freely granted to permit the economic resolution of all related disputes between parties. *Soler,* 103 F.R.D. at 73; C. Wright & A. Miller, Federal Practice and Procedure § 1504 (1971). The new claims raise familiar issues of contract interpretation and application of the Consent Decrees to the Bottler's Contracts. The Court is thoroughly acquainted with the claims, and it will serve the principle of judicial economy to permit the plaintiffs to supplement their complaint.

The Court will grant the plaintiffs' motion to amend Count I of the complaint and file the supplemental pleading of Count II with claims arising from the Company's alleged breach in March, 1987.

## IV. CONCLUSION

The Court will enter an order denying plaintiffs' motion for a preliminary injunction, and will grant plaintiffs' motion to amend and supplement their complaint.