DRABBANT ENTERPRISES, INC., a Delaware corporation, t/a Paree Claree Beauty Salon, and Front Street Properties, a New York general partnership, and Department of Justice of the State of Delaware, as Parens Patriae of the Citizens of the State of Delaware Residing In and Around the Milford Area, and on behalf of the Town of Milford, Plaintiffs,

v.

The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation, Defendant.

Civ. A. No. 88–215 LON.

United States District Court, D. Delaware.

June 27, 1988.

William Prickett (argued), Norman L. Pernick, and Joseph Grey, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiffs.

Donald J. Wolfe (argued), William J. Marsden, Jr., Arthur L. Dent, and David L. Baumberger, of Potter Anderson & Corroon, Wilmington, Del., for defendant.

Michael F. Foster, State Solicitor, and William W. Erhart (argued), Dept. of Justice, Wilmington, Del., as Parens Patriae of the Citizens of the State of Del., residing in and around the Milford Area, Town of Milford.

## OPINION

LONGOBARDI, District Judge.

## I. NATURE OF THE PROCEEDINGS

On April 21, 1988, Front Street Properties, a New York general partnership, ("Front Street") and Drabbant Enterprises, Inc. ("Drabbant") filed a lawsuit against the Great Atlantic & Pacific Tea Company ("A & P") seeking a preliminary injunction and declaratory relief. Plaintiffs seek to enjoin A & P from enforcing a restrictive covenant in its lease. In addition, Plaintiffs are also seeking a declaration that the restrictive covenant is unenforceable and that Defendant is in breach of its lease due to its abandonment of the leased premises. On May 23, 1988, the Court granted a motion by the Attorney General of the State of Delaware to intervene on behalf of the citizens of Milford.

Briefing on Plaintiffs' motion for a preliminary injunction has been completed on an accelerated basis and oral argument

was heard on June 9, 1988. What follows is the Court's decision on Plaintiffs' motion.

## II. BACKGROUND

The Milford Shopping Center was built in 1961. Safeway Stores, Inc. ("Safeway") was the first supermarket tenant in the shopping center. Approximately two months after Safeway entered into its lease, A & P entered into the lease at issue for other space in the shopping center. This lease contained, among other covenants, the following restrictive covenant:

> The lessor obligates himself not to lease, rent or permit to be occupied as a supermarket, grocery store, meat market, produce store or dairy store, except bakery and Safeway Food Market of 14,845 square feet, any property owned or to be owned by him within 2,000 feet of the demised premises herein described during the term of this lease or any extension thereof. This shall be taken as a covenant running with the land that is or may be owned by the lessor within 2,000 feet of the demised premises, not merely a personal obligation of the lessor.

(hereinafter the "Restrictive Covenant"). The A & P lease was amended several times over the life of its term. One of the amendments that impacts upon this litigation extended the term an additional fifteen years, granted A & P the right to renew for four additional five year periods and reflected the subsequent enlargement of the leased premises.

In 1977, Safeway chose not to continue its lease. It moved to a new location in the Milford Village Shopping Center ("Milford Village") approximately two miles from the Milford Shopping Center.

In October, 1979, the landlord notified A & P that it intended to lease the old Safeway premises to B. Green, Inc. ("B. Green") in order to place another supermarket in the shopping center. A & P, however, sought to enforce the Restrictive Covenant against B. Green. Although B. Green brought an action in state court seeking to have the Restrictive Covenant declared unenforceable, the suit was subsequently dismissed without prejudice.

The Milford Shopping Center was bought in 1986 by Front Street, a Plaintiff in this action. All of the leases in the shopping center were reviewed by Andrew Kaplan, a general partner of Front Street.

In April, 1987, A & P renewed its lease for five years but began looking for an alternate site for its supermarket. As a result, A & P opened discussions with Safeway for the purchase of three of its stores, including the one in Milford Village. In June of 1987, A & P transferred control of the property in the Milford Shopping Center to its wholly-owned division, Super Fresh. As a result, the store was converted to a Super Fresh store. In July, 1987, A & P completed its purchase of the Safeway property in Milford Village. On August 28, 1987, A & P closed down its Super Fresh operations in the Milford Shopping Center and moved the operations to the newly purchased property in the Milford Village. Since that time, A & P has paid its rent on the leased premises at the Milford Shopping Center but has kept it empty and has insisted on its continued right to enforce the Restrictive Covenant on the premises formerly occupied by the Safeway store.

In the interim, Plaintiff Front Street was able to let the old Safeway property in the Milford Shopping Center to an auto parts store. In February of this year, Front Street filed a complaint in the Justice of the Peace Court of the State of Delaware, in and for Kent County, against A & P for summary possession of the property. Plaintiff voluntarily dismissed the action. At the same time, Front Street has been searching for a new supermarket tenant for the old Safeway premises in the Milford Shopping Center and has successfully negotiated with its auto parts tenant to move the auto parts store to an alternate location in the shopping center at Plaintiff's option. On April 28, 1988, Plaintiffs filed this action seeking relief from A & P's actions based upon federal and state claims.

## III. CONTENTIONS OF THE PARTIES

### A. State Law Claims

Plaintiffs set forth a number of arguments in support of their claim that De-

fendant A & P is unreasonably and illegally enforcing its Restrictive Covenant. Plaintiffs first argue that the Restrictive Covenant applies to any "property" within 2,000 square feet of the A & P premises *except* the 16,275 square feet formerly occupied by Safeway Food Market. Docket Item ("D.I.") 21, at 50–51. Plaintiffs contend that the plain meaning of the words used in the covenant require such a reading and that it is illogical to argue, as does the Defendant, that the exemption from the use restriction would only apply to the Safeway business rather than the property itself. Moreover, even if the language could be construed as ambiguous, it is settled law in Delaware that any ambiguity in a restrictive covenant is to be resolved in favor of unrestricted land use.

Plaintiffs alternatively argue that the Restrictive Covenant as interpreted by Defendant is unenforceable as a matter of Delaware law. Covenants to restrict land use are enforced only if reasonable and equitable. No one disputes that under certain circumstances restrictive covenants which protect the grantee from competition from competitors will be upheld so long as they are reasonable in both scope and geography. However, the Restrictive Covenant in question, if it is interpreted to exempt only the now defunct Safeway store, would be unreasonable and inequitable. Plaintiffs contend that A & P can claim no legitimate purpose for continuing to enforce the Restrictive Covenant under the present circumstances. Because A & P has vacated the Milford Shopping Center without any intention of ever returning or subleasing its premises to another supermarket, Plaintiffs contend A & P cannot now be heard to enforce the Restrictive Covenant because the covenant cannot possibly compromise A & P's now defunct operation in the Milford Shopping Center. *Id.* In all other respects, Plaintiffs contend, the Restrictive Covenant is unreasonable.

Plaintiffs next contend that they are entitled to summary possession because A & P is in breach of its lease. D.I. 21 at 59. The lease which A & P signed with Front Street's predecessor in 1961 provided that A & P would operate as an "anchor tenant"

in the Milford Shopping Center "for the purpose of a general merchandise business." D.I. 25A at 9. On November 12, 1971, the original lease was amended to read in pertinent part "lessee shall *continue to occupy* the premises under the terms of the extended lease...." *Id.* (emphasis added). A & P, they allege, is in breach of its lease because it has, without warning, deliberately vacated its premises which, under the lease, it had a duty to continuously occupy and operate as an anchor tenant. They also allege that the economic viability of the satellite stores depends upon the continued operation of at least one supermarket.

Plaintiffs further argue that A & P has breached its duty of good faith and fair dealings. Plaintiffs contend that A & P has acted in bad faith both with respect to its obligations under the lease as well as with regard to its dealings with the other tenants and consumers at the Milford Shopping Center. In support of its argument, Plaintiffs contend that while A & P has been looking for an alternate site for its supermarket for over ten years, it never intimated that fact to the Plaintiffs or the consumers in Milford. D.I. 21 at 67. Moreover, once A & P vacated their premises in the Milford Shopping Center abruptly and without notice, A & P persisted in making no affirmative efforts to assign or sublet the premises until Plaintiffs initiated its summary possession action in February of 1988. *Id.* at 68. In conclusion, Plaintiffs argue that A & P's breach of an implied covenant of good faith and fair dealings alone warrants a cancellation of its lease and an immediate return of its premises to Front Street.

Defendant, on the other hand, argues that Plaintiffs have failed to demonstrate a probability of success on any of their state law claims. Defendant first argues that its lease with Front Street contains neither an express nor an implied covenant to continuously operate a supermarket on the premises. While Defendant concedes that its lease provides that it shall "continue to occupy the premises" in the Milford Shopping Center, that language does not impose

upon A & P the duty to continuously operate a supermarket on the premises. Rather, a temporary vacancy of the leased property is permissible while A & P seeks a subtenant. D.I. 25 at 22.

Defendant further contends that, in the absence of express language in the lease, the Court should not imply a covenant of continuous operation. Moreover, because A & P is free to assign or sublet the premises, it would be inconsistent to impose a duty upon A & P to continuously operate its business throughout the term of its lease. *Id.* at 32. Finally, the Defendant argues that Plaintiff Front Street's other leases with smaller tenants contain express covenants to continuously operate and, therefore, had Front Street intended to impose such an obligation upon A & P, it could have so provided by express language.

Defendant next argues that the Restrictive Covenant is both enforceable and reasonable. The language which exempts the Safeway Store from the Covenant's restrictions cn the use of property surrounding A & P's premises is clear and unambiguous. The Restrictive Covenant clearly prohibits Front Street from leasing the former Safeway premises to a tenant for use as a grocery or food store during the term of A & P's lease. D.I. 25 at 34. The language of the Restrictive Covenant which excepts Safeway Food Market and Bakery from the use restrictions clearly refers only to those entities and not to the property itself.

Defendant next contends that the Restrictive Covenant is enforceable under Delaware law. Delaware courts consistently uphold restrictive covenants so long as they are reasonable under the circumstances. A & P contends that the Restrictive Covenant is limited in scope and geography and that it continues to serve a useful and valid purpose. Finally, Defendant argues that it has not breached any implied duty of good faith which Plaintiffs argue is engrafted upon every contract. D.I. 25 at

57–58. On the contrary, Plaintiffs are attempting to impose a new set of contractual obligations which are nowhere to be found in A & P's lease. In addition, Plaintiffs' repeated assertions that A & P agreed in its lease to operate as an "anchor tenant" are unsupported by the terms of the lease itself. Therefore, Plaintiffs' argument as to any alleged breach of an implied duty of good faith must necessarily fail.

### B. *Federal Claims*

The Plaintiffs allege that the Defendant has violated Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2.[1] As to three common elements of their several theories to support their contention, the Plaintiffs argue that this Court has jurisdiction to hear their antitrust claims and that they have presented enough facts to establish the relevant geographic and product markets. First, the Plaintiffs contend that this Court has jurisdiction over their federal claims because the enforcement of the Restrictive Covenant both occurs in and substantially effects interstate commerce. D.I. 21 at 33. In support of their position, Plaintiffs point out, *inter alia*, that a national supermarket chain's anti-competitive conduct has a substantial effect on interstate commerce; that the food sold in Defendant's stores originates from all over the country and is distributed to its stores in the Philadelphia division from warehouses in New Jersey and Maryland. The Restrictive Covenant at issue, they contend, is a feature in many of the Defendant's supermarket leases and the Restrictive Covenant is directed at Defendant's competitors who ship goods in interstate commerce. *Id.* at 33–36.

The second and third common elements of the federal claims are their relevant markets. The Plaintiffs maintain that the relevant geographic market is the Milford Shopping Center. This proposition, they

---

1. Plaintiffs complaint also sets forth violation of the Delaware antitrust laws, 6 Del.C. §§ 2101–2114. The Delaware Antitrust Act requires that the state law be construed in harmony with the interpretation of the federal antitrust law. 6 Del.C. § 2113. Consequently, this Court's discussion and decision with regard to the Plaintiffs' Sherman Act claims shall dictate the ruling in the Plaintiffs' state antitrust claims.

allege, is supported by the fact that the Milford Shopping Center is a small town shopping center that serves many senior and young families; that the other two shopping centers in the town are "significantly inconvenient" because of the distance and transportation barriers; and that the Milford Shopping Center is intended to be a one-stop-shopping center. D.I. 21 at 37–38; D.I. 26 at 27. The Plaintiffs do suggest, alternatively, that if this Court should not agree with the Plaintiffs' position, then the Court should consider the town of Milford itself as the relevant geographic market. D.I. 21 at 38 n*. Third, the Plaintiffs assert that the relevant product market is the "sale at retail of goods typically sold in supermarkets and grocery stores, including meats, produce, diary, bakery and household items." *Id.* at 36.[2]

Having set forth the necessary jurisdictional predicate and the relevant markets for the antitrust analysis, Plaintiffs argue that the Defendant has violated Section 1 of the Sherman Act. Plaintiffs attempt to satisfy the concerted action requirement for a Section 1 claim by suggesting, alternatively, that A & P has conspired with its wholly-owned subsidiary, Super Fresh, or that A & P has conspired with Safeway. *Id.* at 32 n.*; D.I. 26 at 30. If this Court should find concerted action, it is argued that the Defendant's conduct fails the rule of reason test. The Plaintiffs ask the Court to consider, *inter alia*, the facts that (1) A & P exercised its option to renew the lease even though its move to another location was imminent; (2) that A & P suddenly vacated its Milford Shopping Center premises; (3) that the Defendant's motive in maintaining its lease and enforcing the Restrictive Covenant is anti-competitive; (4) that the complained of conduct has a devastating effect on the consumers in the community because A & P effectively controls the alternate supermarket locations,

thus depriving many families of a local supermarket and raising prices; and (5) that A & P's absence from the Milford Shopping Center makes the enforcement of the Restrictive Covenant unreasonable and obviates the possible original economic justification for its existence. D.I. 21 at 38–47.

The Plaintiffs also allege a violation of Section 2 of the Sherman Act in that the Defendant has monopolized and attempted to monopolize the retail sale of food goods in the relevant geographic market. D.I. 21 at 48. Although the claims of monopoly and attempted monopoly are separate and distinct claims, the Plaintiffs' analysis seemingly combines the two. Plaintiffs argue that they can show intent to monopolize through testimony of A & P which reveals A & P's intent to capture 28% of the market share, as well as through Defendant's conduct. Furthermore, Plaintiffs contend that A & P's attempted enforcement of the Restrictive Covenant satisfies the requirement of showing an overt act aimed at achieving monopolization. *Id.* at 49. Finally, under this broad allegation of a Section 2 violation, Plaintiffs maintain that they can establish a dangerous probability of A & P achieving monopolization since the Defendant admits it hoped to achieve a 28% market share in Milford since Defendant "no doubt intends to aggressively attempt to increase its share of the Milford market of food dollars" and since Acme, which presently possesses 36% of the market share "could also possibly leave Milford or suffer serious deterioration of market share, in which case A & P is positioned to fall into a monopoly position." D.I. 21 at 49; D.I. 26 at 33–34.

Needless to say, the Defendant raises several arguments in support of its denial that it has violated the Sherman Act.[3] A &

---

**2.** The parties agree that the relevant product market is the retail food store market. Compare D.I. 25 at 55 n* with D.I. 21 at 36.

**3.** Initially the Defendant raised the issue of whether the Plaintiffs Drabbant and Front Street had standing to raise the antitrust claims because the Plaintiffs were not injured by the alleged antitrust conduct and the damages alleg-

edly suffered were speculative. D.I. 25 at 48. The Defendant's brief was docketed with the Court on May 24, 1988. On May 23, 1988, this Court granted the motion allowing the Attorney General of the State of Delaware to intervene as a party plaintiff on behalf of the Delaware citizens residing in and around the Milford area and the town of Milford. D.I. 24. At oral

P contends that this Court must conclude that the relevant geographic market is the Milford area for two reasons: the Plaintiffs' own market share data is based upon this assumption and it is unreasonable to conclude that a consumer would only look to the Milford Shopping Center for the goods sought. D.I. 25 n*.

The Defendant argues, furthermore, that the Plaintiffs' Section 1 claim must fail for two reasons. First, the Plaintiffs are unable to prove concerted action between A & P and either Super Fresh or Safeway. *Id.* at 50; D.I. 29 at 47–48. Second, the Restrictive Covenant satisfies the rule of reason test since it only applies to the Milford Shopping Center and alternative sites are available.

Similarly, the Defendant maintains that Plaintiffs' Section 2 claims must also fail. The Defendant argues that, as a matter of law, Plaintiffs' Section 2 monopolization claim must fail because Plaintiffs allege that A & P has captured only 28% of the market. D.I. 25 at 56. Furthermore, relief cannot be granted on the attempted monopolization claim because Plaintiffs have failed to establish the requisite intent and dangerous probability that A & P will be successful in achieving a monopoly. *Id.* at 57.

## IV. DISCUSSION OF LAW

The standards for granting or denying a motion for a preliminary injunction are well established. A preliminary injunction is not granted as a matter of right. *Norfolk Southern Corp. v. Oberly,* 594 F.Supp. 514, 519 (D.Del.1984), citing *Eli Lilly and Co. v. Premo Pharmaceutical Labs.,* 630 F.2d 120, 136 (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). It is an extraordinary remedy and must be sparingly granted. *Norfolk Southern Corp.,* 594 F.Supp. at 514, citing *Dorfmann v. Boozer,* 414 F.2d 1168 (D.C. Cir.1969); *Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc.,* 376 F.2d 543, 547

(3d Cir.1967). In order to obtain a preliminary injunction, the moving party must show "(1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest." *Kennecott Corp. v. Smith,* 637 F.2d 181, 187 (3d Cir.1980), citing *Constructors Ass'n of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978); *Delaware River Port Auth. v. Transamerican Trail. Tr., Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974). Merely establishing a risk of irreparable harm is not enough. *ECRI v. McGraw-Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987). Rather, the moving party has the burden of proving a "clear showing of immediate irreparable injury." *Id.,* quoting *Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 359 (3d Cir.1980).

Moreover, where the moving party is asserting what is essentially economic injury, he must meet a more stringent standard to show that the harm is peculiar or special. In *Coca-Cola Bottling of Elizabethtown v. Coca-Cola Co.,* 668 F.Supp. 906, 910 (D.Del.1987), the court held that where the alleged harm is economic, "[t]he threshold of 'peculiarity' that the proposed action threatens must be high, because purely economic injuries are generally compensable and do not require injunctive relief." The court went on to note that particularized proof of the direct harm caused by the defendant was necessary in order for the plaintiffs to demonstrate that the threatened injury was "sufficiently peculiar." *Id.*

■ In the instant case, the Court finds that the harm which the Plaintiffs allege they are suffering is primarily economic in nature. The loss of business and customers the tenants in the Milford Shopping Center are allegedly suffering and will continue to suffer is necessarily economic.

argument, counsel for the Defendant asked this Court not to rule on the standing issue since the Attorney General intervened. Transcript, D.I. 29 at 46. The Defendant did, however, seek to

preserve this issue for briefing before trial, in particular as to the Plaintiffs Drabbant and Front Street. *Id.* at 46–47.

This Circuit has consistently held that "purely economic injuries are generally compensable and do not require injunctive relief." *Coca–Cola Bottling*, 668 F.Supp. at 910. *See also ECRI*, 809 F.2d at 226 ("[W]e have never upheld any injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law.") (citations omitted). Therefore, as discussed *infra*, the harm must be sufficiently peculiar and special to justify the extraordinary form of relief Plaintiffs are requesting.

■ In support of their assertion that A & P's actions will cause Plaintiffs irreparable harm, Plaintiffs rely upon three affidavits. The affiants attest to the fact that the Milford Shopping Center "from its inception in 1961 ... was intended to operate with two supermarket anchor tenants." Affidavit of Orville W. Shockley, D.I. 17, ¶ 7; *see also* Affidavit of Clara Drabbant, D.I. 16, ¶ 5; Affidavit of Jack A. Nylund, D.I. 18, ¶ 7. In light of that fact, Plaintiffs contend that, with the departure of the first Safeway store in 1977 and now A & P's departure in August of 1987, the loss to the shopping center is "extremely adverse." D.I. 16, ¶ 9. The affiants also assert that A & P's departure "continues to have a serious negative effect on the Milford Shopping Center, its tenants ... as well as the community area of Milford." *Id.*, ¶ 10. *See also* D.I. 18, ¶ 9.

Plaintiffs also contend that they are facing the possibility of bankruptcy if A & P is allowed to continue its anticompetitive policies. In support of their claim, Plaintiffs' affidavits attest to the fact that the future of the Milford Shopping Center is "very dark" and potentially "financially ruinous" because of A & P's actions. Unless an anchor supermarket tenant is allowed to operate in the shopping center, many of the tenants, including Plaintiff Drabbant, will face "possible insolvency." D.I. 16, ¶¶ 7, 9, 11; D.I. 17, ¶ 10; D.I. 18, ¶¶ 8, 10. Signifi-

cantly, however, Plaintiffs have produced no facts to support such generalized assertions of potential bankruptcy. Also, Plaintiffs have produced no specific evidence to show how A & P's actions are directly causing them harm. For example, they have not produced any financial data or other facts to substantiate what must be characterized as hyperbole. The Court has no evidence of the extent or amount of harm Plaintiffs will suffer. Based upon the record before this Court, it is impossible to conclude that "damages when ascertained according to legal rules, would not be a just and reasonable substitute." *A.L. K. Corporation v. Columbia Pictures Industries, Inc.*, 440 F.2d 761, 763 (3d Cir. 1971). Therefore, in the absence of more specific proof of the peculiar nature of the harm Plaintiffs will suffer if a preliminary injunction is not granted, the Court finds that Plaintiffs have not sustained their burden. "Mere assertions of dire economic effects cannot, without some concrete proof, meet the irreparable harm standard." *Coca–Cola Bottling*, 668 F.Supp. at 913.

■ Furthermore, not only have Plaintiffs failed to show irreparable injury but the record is devoid of proof that the harm they will suffer is immediate or imminent. The affidavits submitted by Plaintiffs make reference to the "great potential" possibility of bankruptcy or the "possible insolvency" facing the satellite tenants. D.I. 16, ¶¶ 9, 11; D.I. 18, ¶¶ 10, 11. While Ms. Drabbant also avers that "the present tenants will be driven out of business, rendered insolvent and/or bankrupt", this statement, like others similar to it, is completely unsubstantiated. D.I. 16, ¶ 15.[4] The affidavits are facially inconsistent in that the alleged harm appears simultaneously to be both immediate and potential. Moreover, Mr. Kaplan, a partner of Front Street, testified that, if he continues to lose

---

4. Other similarly unsupported statements include the following:

Prospective tenants will be irretrievably lost to vacant stores in the shopping center;
Present tenants will likely refuse to renew leases as they expire;
Revenues to tenants, including the Beauty Shop, and Front Street, will continue to be incalcuably depressed; and damages suffered by consumers caused by the lack of competition will be impossible to calculate.
D.I. 16, ¶ 15.

money at the present rate, "Front Street will have to borrow money, without a doubt, if it doesn't want to go into foreclosure." Deposition of Andrew Scott Kaplan, D.I. 30 at 162–63. If Plaintiffs can borrow money, it is difficult to see how bankruptcy is imminent.

Furthermore, the affidavits themselves reveal the fact that any alleged harm Plaintiffs will suffer cannot be imminent and solely as a result of Defendant's actions. Mr. Shockley states that as early as 1977, when the Safeway Supermarket left the shopping center, "[t]he effect of losing this tenant, and of the owner's inability to relet this space to another supermarket tenant was adverse to the economic well being and viability of the Milford Shopping Center." D.I. 17, ¶ 9. Thus, as far back as 1977, Plaintiffs were predicting the demise of the shopping center. If the Milford Shopping Center was facing adverse economic conditions as far back as 1977, the Court finds it difficult to understand how Plaintiffs are presently suffering a new and imminent harm. While the Court is not unaware that, with the passage of time and the departure of A & P as well as other tenants, those adverse economic conditions may have worsened, the Court is unpersuaded that the harm is imminent and solely a result of A & P's present actions.

In order for the Plaintiffs to demonstrate their need for a preliminary injunction because of the imminent harm they are facing, they must also show that it is A & P's actions which are harming them. If A & P is not the cause of their injury, then a preliminary injunction enjoining A & P's actions would be pointless. While the Plaintiffs' affidavits repeatedly state that A & P's departure is the cause of their harm, they offer no concrete evidence to support that allegation. Indeed, Plaintiffs' repeated assertions that the Milford Shopping Center "from its inception" was intended to operate with two anchor supermarket tenants are unsupported in the record. D.I. 17, ¶ 7. Neither A & P's lease nor any other source of evidence supports the proposition that A & P was to be an "anchor tenant." Specifically, Mr. Kaplan

testified that during 1987, Front Street suffered a loss of $37,000. D.I. 30 at 89. A & P, however, was operating its supermarket during eight months of that year. Moreover, Mr. Kaplan could not recall whether or not Front Street had ever shown a profit during any of the quarters in 1987. *Id.* Therefore, the losses suffered by Front Street during 1987 are not clearly attributable to A & P's departure. Indeed, Mr. Kaplan stated that the only profits Front Street ever made since its purchase of the Milford Shopping Center was a total of $3,700 in 1986. *Id.* at 90. Mr. Kaplan also testified as further proof of the harm Plaintiffs are suffering that, in the first quarter of 1988, Front Street suffered a loss of $20,000. *Id.* at 89. The Court finds such evidence unpersuasive. Because of Front Street's record of losses prior to A & P's departure, the fact that in 1988 it suffered a $20,000 loss for the first quarter does not establish that A & P was the cause. In addition, because of Safeway's departure in 1977, it is unclear what adverse economic effect that supermarket's departure (as opposed to A & P's) had on the shopping center. Whether the presence of the Restrictive Covenant kept it vacant or whether other economic factors were at work is not revealed in the present record.

The evidence presented does not paint a picture of a thriving and profitable shopping center that has suddenly faced an economic decline due to the departure of one of its supermarket tenants. Rather, the evidence suggests that the Milford Shopping Center had been operating at a loss even when A & P was present in the shopping center. Based upon the foregoing facts, therefore, the Court finds that Plaintiffs have failed to carry their burden of showing that A & P's departure and enforcement of its Restrictive Covenant is threatening Plaintiffs with imminent bankruptcy.

In addition to the Court's determination that Plaintiffs have failed to establish irreparable injury, the Court is also not persuaded that the balance of equities tips in favor of granting Plaintiffs' motion for a preliminary injunction. Absent a showing

that the injury of which Plaintiffs allege is both immediate and irreparable, the Court is unwilling to exercise its power of granting an extraordinary remedy at this preliminary stage in the litigation. The harm to the Defendant were a preliminary injunction granted at this stage outweighs any potential injury Plaintiffs may suffer as a result of A & P's actions. Moreover, as this Court has held, "[i]f relief were to be granted, the status quo would not be maintained and the Plaintiffs would have gained everything they would have gained after a trial on the merits." *Norfolk Southern,* 594 F.Supp. at 523.

While the Court need not reach the issue of the probability of success on the merits as to Plaintiffs' state law claims, as indicated at oral argument, there are elements of Plaintiffs' position which require serious attention by the Defendant. The more noteworthy factual underpinings of Plaintiffs' argument include the plain meaning of the amended lease provision requiring that the Defendant "shall continue to occupy the leased premises", A & P's actions in attempting to find a new tenant and, finally, the limited scope of the Restrictive Covenant derived either from its plain meaning or from the ambiguity of the terms used.

## V. PLAINTIFFS' ANTITRUST CLAIMS

While declining to reach the probability of success as to Plaintiffs' state law claims, the interests of judicial economy compel the Court to decide the probability of success of Plaintiffs' antitrust claims. Plaintiffs' failure to establish irreparable injury would be sufficient to deny the motion for a preliminary injunction.

### A. *Jurisdiction Over Plaintiffs' Sherman Act Claims*

■ In order for this Court to have jurisdiction over the Plaintiffs' federal antitrust claims, the allegedly illegal conduct must either be in the flow of interstate commerce or, though occurring on a local level, substantially affect interstate commerce. *Harold Friedman Inc. v. Thorofare Markets,* 587 F.2d 127, 132 (3d Cir.1978). The second test is considered from the perspective of "whether the local activity has a significant impact on competition in commerce and whether the commerce so affected is substantial in volume." *Id.* In *Harold Friedman,* the court considered the facts that the exclusivity clause at issue was used by Thorofare in other leases; that Thorofare enforced the covenant against a potential out-of-state tenant; and the fact that the value of the goods traveling through interstate commerce to Friedman's and Thorofare's stores was substantial. *Id.* at 134–35. The Third Circuit also went on to explain:

> As the corporate practices of such supermarket chains as Thorofare amply demonstrate, the retail sale of food and household commodities is no longer effectuated solely through neighborhood grocery stores that order their supplies independently from local wholesalers. Although the consumer outlets necessarily must serve discrete localities, the trend is toward increased concentration in the intrastructure that administers and supplies the local stores. Therefore, when a large interstate supermarket chain is in the picture, anticompetitive activities directed at an individual store will inevitably have a substantial effect upon the flow of goods across state lines to either the victimized establishment or the firm that is engaged in the anticompetitive practice, if not to both. Where, as here, such interstate supermarket industry is involved, it cannot be said that the "relationship to interstate commerce is too tenuous in a practical sense to warrant federal control."

*Id.* at 136 (footnotes omitted). Consequently, the court concluded that there was jurisdiction to hear the Sherman Act claims.

The Defendant is a large interstate supermarket chain. The Super Fresh division supermarkets are supplied by warehouses in New Jersey and Maryland and they supply the stores in Pennsylvania, New Jersey and Delaware by shipping the products in interstate commerce. Deposition of Julian J. DiFiore, D.I. 32 at 35. The products that are gathered in these warehouses come from locations across the country. *Id.*

The Restrictive Covenant at issue in this case, furthermore, is similar to ones used by A & P and its assignees in other states. *See Berkeley Dev. v. Great Atlantic & Pacific Tea,* N.J.Super.L., 214 N.J.Super. 227, 518 A.2d 790 (1986); *Great Atlantic & Pacific Tea Company v. Bailey,* Pa.Super., 421 Pa. 540, 220 A.2d 1 (1966). In light of the holding in *Harold Friedman* and the aforementioned factors, this Court concludes that Defendant's conduct substantially affects interstate commerce thus satisfying the jurisdictional predicate of the Sherman Act.

### B. *Plaintiffs' Section 1 Claim*

█ Section 1 of the Sherman Act provides that "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1. Although the statute's language seems all encompassing, the case law developing Section 1 construes it as prohibiting only those contracts or combinations which unreasonably restrain competition. *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Malley–Duff & Associates v. Crown Life Ins. Co.,* 734 F.2d 133 (3d Cir.1984). Furthermore, Section 1 does not preclude independent action. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Consequently, for A & P's enforcement of the Restrictive Covenant to constitute a violation of Section 1, the Plaintiffs must prove:

(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant products and geographic markets; (3) that the objects of and the conduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of the conspiracy.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).

In order for Plaintiffs to be granted relief based upon a Section 1 violation, the Plaintiffs must show a probability of success of establishing all of the requisite elements of such a claim. In particular, the Plaintiffs must establish that A & P was involved in concerted action in its attempt to restrain trade. *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105 (3d Cir.1980); *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068 (3d Cir.1978). In order to do this, the Plaintiffs must present evidence from which the trier of fact could reasonably infer that A & P and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, Inc.,* 637 F.2d at 111, citing *Klein v. American Luggage Works, Inc.,* 323 F.2d 787, 791 (3d Cir.1963); *United States v. Standard Oil Co.,* 316 F.2d 884, 890 (7th Cir.1963); *see also Monsanto Co.,* 465 U.S. at 768, 104 S.Ct. at 1473 (there must be direct or circumstantial evidence that reasonably tends to prove that the defendants and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective.").

The Plaintiffs attempt to establish concerted action by seeking to prove that A & P conspired with either Super Fresh, its wholly owned subsidiary, or Safeway. As a matter of law, a parent corporation is incapable of conspiring with its wholly owned subsidiary for purposes of a Section 1 violation. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Consequently, if Plaintiffs' Section 1 claim is to survive, they must show that there is a reasonable probability that they will be successful in establishing that A & P and Safeway had a "conscious commitment to a common scheme designed to achieve an unlawful objective."

The Plaintiffs argue that they have established concerted action because A & P made it a condition of its purchase of the Safeway store in the Milford Village that it be able to protect its lease in the Milford Shopping Center and Safeway acquiesced and consented thereto in its sale of the store. D.I. 26 at 30. The Plaintiffs base

their theory upon deposition testimony and a memorandum written by Mr. DiFiore. Unfortunately for the Plaintiffs, the evidence relied upon does not reveal Safeway's conscious commitment to the scheme of enforcing the lease and Restrictive Covenant for the unlawful objective of restraining trade. The memorandum written by Mr. DiFiore upon which Plaintiffs rely was written to F.X. Leonard, head of real estate for A & P and J.Y. Mariner, acting vice president of real estate for A & P at the time. D.I. 20A, Exhibit 1(4).[5] At his deposition, Mr. DiFiore explained that the memorandum was sent to these two men. D.I. 32 at 53. No mention is made in the deposition that Safeway was a recipient of this memorandum. Furthermore, Mr. DiFiore's deposition does not reveal that Safeway was aware of A & P's intent to restrain trade or committed to that end. The deposition testimony reveals only that the precondition of the validity of the Milford Shopping Center lease was agreed to by a director of real estate for A & P, not by Safeway. D.I. 32 at 54. Furthermore, DiFiore agreed with Plaintiffs' counsel's characterization of this memorandum as merely a reminder to the people in A & P's real estate division that they had agreed that the Milford Shopping Center lease would be enforceable.[6]

Thus, rather than this memorandum appearing as the "smoking gun" upon which Plaintiffs may build its Section 1 claim, it actually begins to look like an intra-corporate memorandum memorializing an intra-corporate condition imposed upon the purchase of the Safeway property in the Milford Village. Rather than implicating Safeway and recharacterizing the innocent appearance of this memorandum, the deposition testimony only reinforces the intra-corporate nature of the memorandum and the "condition." Safeway is never mentioned as a participant to this agreement. The Plaintiffs, furthermore, have not presented any evidence, either in the form of testimony or documents, from Safeway to support the contention that Safeway made a "conscious commitment to a common scheme to achieve an unlawful objective."

Consequently, on the record before this Court on the Plaintiffs' motion for a preliminary injunction, this Court must conclude that the Plaintiffs have failed to carry their burden of showing a probability of success in establishing concerted action between A & P and Safeway to restrain trade. Plaintiffs' failure to carry their burden on probability of success on the merits obviates the need to discuss irreparable injury.

### C. *Plaintiffs' Section 2 Claims*

Plaintiffs allege two claims under Section 2: monopolization and attempted monopolization. For purposes of evaluating both claims, the relevant geographic and product markets must be established. *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp. 1250 (E.D.Pa.1987), and cases cited therein. For the purposes of this motion, the parties seem to agree on the relevant product market. This Court,

---

5. The Plaintiffs latch upon the language "one of the conditions by which the Milford Safeway purchased by Super Fresh was agreed to was that the old Milford Super Fresh location would be totally protected." D.I. 20A, Exhibit 1.

6. The pertinent part of the dialogue between Plaintiffs' counsel and Mr. DiFiore is set forth below:

    Q. But you are missing my question. It says here that Mr. DiFiore said, "One of the conditions by which the Milford Safeway," I guess you left out the word was purchased, was "purchased by Super Fresh was agreed to was that the Old Milford Super Fresh location would be totally protected."
    What I want to know is who agreed to the condition? Was it Farley? Was it Leonard?

Was it A & P? Who had the responsibility for seeing that that condition was fulfilled?
    A. Real estate.
    Q. Okay. And that would be Farley on your level and Leonard on the next?
    A. Yes.
    Q. And by that you meant, look, we agreed to buy the Milford Safeway place provided you people would guarantee that the former location would be totally protected; is that right?
    A. Yes.
    Q. And you are just reminding them of that now; is that right?
    A. Yes.
    D.I. 32 at 55.

therefore, must determine the relevant geographic market.

### (1) The Geographic Market

■ The determination of the relevant geographic market results from analyzing competition. *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir.1982). It is the area in which "a potential buyer may rationally look for the goods and services he or she seeks." *Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir.1984); *Borough of Lansdale*, 692 F.2d at 311. It is a question of fact concerning which the Court must recognize the commercial realities of the issue at question resolved on a case by case basis. *Borough of Lansdale*, 692 F.2d at 311.[7]

The parties dispute whether the geographic market should be the Milford Shopping Center or the town of Milford. This Court finds that the Plaintiffs have failed to carry their burden of showing a probability of success of establishing that the relevant geographic market is the Milford Shopping Center. The thrust of the Plaintiffs' argument is that the Milford Shopping Center should be considered the relevant geographic market since it serves the immediate community within walking distance of the stores. D.I. 21 at 37. More specifically, it serves those consumers who are senior citizens or less mobile. The other two supermarkets, A & P's Super fresh and its competitor, Acme, are two

miles away from the Milford Shopping Center.[8] Hence, Plaintiffs argue, it is not within walking distance for those in the community around the Milford Shopping Center. Furthermore, Plaintiffs assert that there are traffic barriers around the Milford Village which cut down on its accessability. D.I. 21 at 37. To support their position, Plaintiffs cite to three affidavits they filed with the Court. Each of these remarkably similar affidavits make bald assertions. Two of the affidavits state:

> Many of the people in this area are young families as well as senior citizens and other than some local corner operations Mom and Pop stores and convenience markets, the only other places to shop for food and grocery items are Super Fresh and Acme stores in the shopping centers that border the west most sites of the corporate limits of the City of Milford.

*Compare* D.I. 18, ¶ 9 with D.I. 16, ¶ 10. The third affidavit merely states that because the Acme and Super Fresh are two miles from the Milford Shopping Center they present "a significant inconvenience for many consumers in Milford, many of whom are elderly and depend on the convenience of the Milford Shopping Center to satisfy their daily needs." D.I. 17, ¶ 11. Thus, the Court is presented with statements by these three affiants in addition to the statements made in the Plaintiffs' brief. The Plaintiffs do not suggest that their affiants are experts upon whose opinion this Court may rely.[9] Nor do the Plain-

---

7. Two commentators set forth the following factors to consider:

Definition of the relevant geographic market depends on the commercial realities of the community in which the shopping center is located. Factors to be considered include: the area which the center serves; the location and number of competing centers or "free standing" retail outlets within that area or in reasonably close proximity; and factors such as physical barriers, traffic flow patterns, zoning restrictions, locations of suppliers and shifts in the consumer population.

Reilly & Keys, *The Antitrust Aspects of Restrictive Covenants in Shopping Center Leases*, (ICSC 1986), 22.

8. There seems to be some dispute over the distance of the Super Fresh from the Milford Shop-

ping Center. The Defendant alleges, without citing affidavits or deposition testimony, that the Super Fresh is approximately one mile away. D.I. 25 at 5. The Plaintiffs, on the other hand, submit affidavits all stating, in the exact same wording, that the nearest supermarkets, presumably the Super Fresh and Acme, are two miles away. D.I. 16, ¶ 10; D.I. 18, ¶ 9. For purposes of this motion, the Court will assume, without deciding, that the Super Fresh in the Milford Shopping is two miles away from the Milford Shopping Center.

9. In point of fact, the affiants are: (1) a president of his own insurance agency who leases space in the Milford Shopping Center; (2) the president and chief executive officer of the Southern Delaware Chamber of Commerce; and (3) the vice president of the corporation

tiffs present the Court with any demographic data or statistics which would reveal the age of the community, those who own cars in the area, the distances traveled by those who use the Acme or Super Fresh, or other data that would assist the Court in making its determination.[10] In light of the evidence presented at this time on the Plaintiffs' motion for a preliminary injunction, this Court must conclude that the Plaintiffs have failed to carry their burden of showing a probability of success in establishing the Milford Shopping Center as the relevant geographic market.[11]

For the purpose of this motion, however, this Court concludes that the Defendant will probably be successful in establishing the town of Milford as the relevant geographic market. It appears that the commercial realities of this situation support this conclusion. The Defendant's own business perspective on moving from the Milford Shopping Center to the Milford Village indicates that it considered the town of Milford as the market in which it must increase its market share. D.I. 20A, Exhibit 1. In point of fact, when the Plaintiffs discuss the Defendant's market share for purposes of its Section 2 claim, they use the market share percentage based upon the town of Milford. *See* D.I. 21 at 40, 49. Furthermore, the Court recognizes that the

distance of two miles between A & P and Acme's location and that of the empty property may not be great enough to establish the Milford Shopping Center as a distinct geographic market; rather, the distance of only two miles indicates that these locations should be considered as falling into one geographic market. The Plaintiffs unintentionally note two characteristics of this situation which supports this conclusion. The Plaintiffs characterize the two shopping centers which separately contain the Super Fresh and Acme as "regional" shopping centers. D.I. 21 at 37. The concept of these two shopping centers being regional ones creates the inference that those who shop there come from distances greater than two miles. The region which they serve implicitly encompasses the same population market as that which the Milford Shopping Center serves. Secondly, the Plaintiffs themselves recognize that those who signed the petitions submitted to the Court come from the town of Milford. D.I. 26 at 28. It has not been disputed that the A & P in the Milford Village serves the town of Milford. Furthermore, the petitions reveal that a supermarket in the Milford Shopping Center would serve the people in the town of Milford. Therefore, if both shopping centers serve the same group of consumers, it seems reasonable to

which operates a beauty shop in the Milford Shopping Center. The latter two are those that submit the remarkably similar testimony.

**10.** The Plaintiffs do submit a petition attached to one affidavit. D.I. 17. While petitioners are effective in the political process, their impact is lessened in a court of law which adjudicates and preserves the rights of individuals, even if it is against the voice of the majority. In this instance, the people signed a petition stating: "We want and must have a food store in Milford Shopping Center. If you feel the same, please sign this petition below. Your help and support is greatly appreciated, by all of the tenant [sic] of the Shopping Center." *Id.* Thus, rather than providing the Court with the much needed demographic information, the Plaintiffs have supplied a list of those who feel that they want a food store in the Milford Center. The importance of the petition is undermined, moreover, after a quick perusal of the petition reveals that people outside of the Plaintiffs' asserted geographic area have signed them. If people outside of the Plaintiffs' geographic market are willing to travel to the Milford Shopping Center,

why should the court assume that those in the community around the Milford Shopping Center are unable to travel two miles to the Milford Village?

**11.** In their brief, Plaintiffs state that the "'one-stop-shopping' aspect of a functioning and viable Milford Shopping Center also reconfirms the almost obvious fact that the Milford Shopping Center itself represents the relevant geographic market in this case." D.I. 21 at 38. For support, Plaintiffs cite Reilly & Keys at 22 and *State of Maryland v. Lee's Sport, Inc.,* 1981–2 Trade Cases, ¶ 64,365 (Md.Cir.Ct.1981). The Court finds this unpersuasive. First, Reilly and Keys refer to the "one-stop-shopping" asset in shopping centers as an aspect that defines a "unique *product* market." Reilly & Keys at 22. Secondly, *State of Maryland v. Lee's Sport, Inc.* is an Assurance of Discontinuance which does not constitute an admission by any of the parties with respect to any issue of fact or law except as provided in the Maryland Commercial Law Code Annotated, section 11–206(c). *Lee's Sport, Inc.,* 1981–2 Trade cases ¶ 64,365 at 74,-686.

conclude that one geographic market encompasses these two shopping centers: the town of Milford. For these reasons, the Court concludes that the probability of success in establishing the town of Milford as the relevant geographic market weighs in favor of the Defendant.

### (2) Plaintiffs' Monopoly Claim

■ In order for Plaintiffs to establish that Defendant has violated Section 2 by achieving a monopoly, Plaintiffs must show: "(1) the possession of monopoly power in the relevant *geographic and product* markets; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen or historic accident." *Pa. Dental Ass'n,* 745 F.2d at 260, citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The courts have recognized that market share is a primary indication of whether monopoly power exists. *Id.*

As a matter of law, the Plaintiffs have failed to show a reasonable possibility of success on the monopoly claim. The Plaintiffs, by relying upon the Defendant's own projections, recognize that the Defendant, at the most, has achieved a 28% market share. D.I. 21 at 48. In an attempt to build up this percentage, the Plaintiffs assert that A & P "no doubt intends to aggressively attempt to increase its share of the Milford market of food dollars, by capturing a significant portion of the 'leakage' estimated by it at 25%, as well as a part of Acme's 36% market share." D.I. 26 at 34. The market share data relied upon by Plaintiffs are projections of market share A & P wanted to achieve after opening the Super Fresh in the Milford Village. *See* D.I. 20A, Exhibit 1. Thus, at the most, these are statistics indicating what Defendant hoped to achieve as opposed to what it now possesses. In any event, for purposes of the monopoly claim, it can be assumed that the Defendant has captured 28% of the market share. This is not enough to indicate monopoly power. In *Pa. Dental Ass'n,* the Third Circuit affirmed the District Court's holding that, as a matter of

law, a 32%–35% market share was insufficient to establish monopolization. *Pa. Dental Ass'n,* 745 F.2d at 261; *See also Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384 (D.Del.1978) (35% insufficient to establish monopolization). Consequently, this Court must conclude that Plaintiffs would probably fail to establish monopolization at a trial on the merits.

### (3) Plaintiffs' Attempted Monopoly Claim

In order for Plaintiffs to establish their Section 2 claim of attempted monopolization, they must show: "(1) a specific intent to monopolize; and (2) the consequent dangerous probability of success within the relevant geographic and product markets." *Pa. Dental Ass'n,* 745 F.2d at 261; *Kellam Energy, Inc. v. Duncan,* 668 F.Supp. 861, 888 (D.Del.1987); *Tasty Baking Co.,* 653 F.Supp. at 1267. As to proving the requisite intent, the Third Circuit has explained that "a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominately motivated by legitimate business aims.'" *Pa. Dental Ass'n,* 745 F.2d at 260–61, quoting *Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).

■ The Court is not completely persuaded that the Plaintiffs will establish the requisite intent for their attempt to monopolize claim. The Plaintiffs rely on several passages from the deposition testimony to show that A & P is maintaining its lease and enforcing the Restrictive Covenant in order to prevent competition with its new Super Fresh store. *See, e.g.,* D.I. 33 at 29–30, 37–38, 48; D.I. 32 at 27–31, 56–59; D.I. 35 at 29. Plaintiffs' claim, however, is that Defendant is attempting to monopolize the retail sale of food goods in the town of Milford. The Defendant's major competition, with 36% of the market share if the Defendant achieved its goal of 28%, is

Acme. Thus, it seems that if Plaintiffs were to clearly establish the intent to monopolize, Plaintiffs should produce evidence of A & P's intent to drive Acme out of the market. Plaintiffs have not done so. Thus, while the evidence presented is compelling, it does not appear to address the entire picture of the Defendant's intent to monopolize the relevant product market in the town of Milford.

Nevertheless, if it is conceded that the Plaintiffs may have possibly established the requisite intent, they have failed to carry their burden of showing a probability of success in establishing a dangerous probability that A & P will succeed in achieving a monopoly position. While market share may be considered by a court in determining whether there is a dangerous probability of monopoly, it is not determinative. *Kellam Energy, Inc.*, 668 F.Supp. at 891. The court may also consider other market characteristics such as "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *International Distribution Centers, Inc. v. Walsh Trucking*, 812 F.2d 786, 792 (2d Cir.1987), cited with approval in *Kellam Energy, Inc.*, 668 F.Supp. at 891; *see also Tasty Baking Co.*, 653 F.Supp. at 1270.

The Plaintiffs rely upon the market share data to support this element of their claim. D.I. 21 at 49. The Plaintiffs point to the Defendant's possible 28% market share and ask the Court to speculate as to what would happen if A & P should capture some of the share from the "Mom and Pop" stores and if Acme possibly left Milford or suffered a deterioration in market share. These hypotheses, highly speculative as they are, do not appear to be a significant evidentiary basis for carrying the burden for the issuance of a prelimi-

nary injunction. On the other hand, it is true that this Court has held that a 35% market share supports a dangerous probability of success in achieving a monopoly. *Outboard Marine Corp.*, 461 F.Supp. at 404.[12] Plaintiffs, however, have failed to explain to this Court how *Outboard Marine Corp.* may apply to these facts and the significance or insignificance of the disparity between a 35% market share and a 28% market share.

The make-up of the market at issue also suggests that the Plaintiffs have failed to carry their burden. According to Defendant's analysis of projected market share, Acme would possess 36% of the market, Meatland, 11%; Super Fresh, 28%; and the "Mom and Pop" stores ("leakage" according to the experts), 25%. Plaintiffs have failed to explain to this Court how there is a dangerous probability that A & P would become a monopoly when one of its competitors has a greater share of the market. The Plaintiffs themselves admit, furthermore, that part of the urgency for this preliminary injunction is that if the owner of the Milford Shopping Center cannot lease the old Safeway property to Meatland, someone will build them a store in Milford. D.I. 30 at 160, 164. It is difficult for this Court to conclude there is a dangerous probability of A & P gaining a monopoly when evidence presented by the Plaintiffs suggests that someone is willing to build a store for Meatland in the geographic market at issue. Considering the present state of the competition and the possibility of even more, cautions against concluding that A & P can gain a monopoly. If that were not enough, Plaintiffs additionally fail to provide the Court with information on the probable development of the industry, the elasticity of consumer demand or the strength of the present competition.[13] Consequently, for the reasons

---

12. It is important to note, however, that in *Outboard Marine Corp.*, the defendants conceded for the purpose of the motion to dismiss that 35% market share constituted a "reasonable probability of success." *Outboard Marine Corp.*, 461 F.Supp. at 404.

13. It seems that the barriers to entry in this product market would be great, although Plaintiffs did not present evidence on this factor. The evidence presented by Plaintiffs, however, indicates that in this particular case, someone is willing to attempt to surmount whatever entry barriers that do exist and provide Meatland a place from which to operate in Milford.

stated above, this Court concludes that the Plaintiffs have failed to carry their burden of showing a probability of success in proving a dangerous probability of A & P successfully gaining a monopoly. As a result, Plaintiffs may not be granted relief on their Section 2 claim of attempted monopoly.

For all these reasons, the motion for a preliminary injunction is denied.